# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 13, 2017       Decided May 16, 2017

No. 16-5189

MARILYN KEEPSEAGLE, ET AL.,
APPELLEES

v.

SONNY PERDUE,
APPELLEE

DONIVON CRAIG TINGLE, SILENT CLASS MEMBER,
APPELLANT

———

Consolidated with 16-5190

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:99-cv-03119)

———

*William A. Sherman* argued the cause for appellant. With him on the briefs were *Reed D. Rubinstein* and *James W. Morrison*.

*D. Craig Tingle* filed the briefs for appellant.

*Joseph M. Sellers* argued the cause for appellees Porter Holder; CLARYCA Mandan, on behalf of themselves and the plaintiff class. With him on the brief were *Christine E. Webber*, *Paul M. Smith*, *Jessica R. Amunson*, and *Amir H. Ali*.

*Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, and *Charles W. Scarborough* and *Carleen M. Zubrzycki*, Attorneys, were on the brief for federal appellee.

*Marshall L. Matz* and *John G. Dillard* were on the brief for plaintiff-appellee Marilyn Keepseagle. *Phillip L. Fraas*, *David J. Frantz*, *Stewart D. Fried*, and *Sarah M. Vogel* entered appearances.

Before: BROWN and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Circuit Judge* WILKINS.

Dissenting opinion filed by *Circuit Judge* BROWN.

EDWARDS, *Senior Circuit Judge*: In 1999, a class of Native American farmers and ranchers filed suit against the United States Department of Agriculture ("the Department"), contending that the Department discriminated against Native American applicants in their claims under farm credit and benefits programs. After more than a decade of contentious litigation, the District Court approved a Settlement Agreement ("the Agreement") in 2011 that created a $680 million compensation fund for the benefit of class members who participated in a non-judicial, administrative claims process.

At the conclusion of the claims process, $380 million still remained in the compensation fund. Under the terms of the Agreement, any leftover funds were to be distributed to *cy-près* beneficiaries – *i.e.*, non-profit organizations that provided services to Native American farmers. Because the parties had not anticipated such a large remainder, they entered into negotiations to modify the Agreement. The parties' initial attempt at modification was unsuccessful. However, a second effort resulted in an addendum to the Agreement that is the subject of the dispute in this case. Under the terms of the addendum, the *cy-près* process would be reformed to distribute funds more efficiently and supplemental payments would be awarded to class members who had successfully recovered from the compensation fund.

The District Court approved the addendum to the Agreement, concluding that it was "fair, reasonable, and adequate" under Federal Rule of Civil Procedure 23(e)(2) ("Rule 23"). The District Court found that the addendum reflected a compromise between two competing goals: paying out more funds to claimants who successfully recovered through the claims process, and maintaining the *cy-près* distributions for the benefit of the class as a whole.

Two class members – class representative Keith Mandan ("Appellant Mandan") and class member Donivon Craig Tingle ("Appellant Tingle") – appealed to this court, raising four principal arguments. *First*, Appellant Mandan claims that under the Agreement's modification clause, the proposed addendum cannot be approved without his assent. *Second*, Appellant Mandan disputes that the addendum is "fair, reasonable, and adequate." *Third*, Appellant Mandan asserts that the *cy-près* provision of the Agreement is unconstitutional, in violation of the Appropriations Clause, and unlawful under

the Judgment Fund Act. *Fourth*, Appellant Tingle alleges that class counsel and class representatives breached their fiduciary duties to class members. Both Appellants, who successfully obtained payments through the claims process, contend that all of the $380 million still remaining in the compensation fund should be distributed *pro rata* to the successful claimants.

We affirm the judgment of the District Court. We reject the claim that the modification clause requires Appellant Mandan's assent before the Agreement can be amended. We further hold that the District Court did not abuse its discretion in finding that the addendum was fair, reasonable, and adequate. We decline to reach the merits of Appellant Mandan's legal challenges to the *cy-près* provision because these claims were *explicitly waived* before the District Court. The claims were also forfeited because Appellant Mandan never raised any legal challenges to the *cy-près* provision before the District Court despite clear opportunities to do so. And there are no good reasons at this late date in the litigation for this court to entertain Appellant Mandan's legal challenges to the *cy-près* provisions in the first instance. Finally, we find no merit in Appellant Tingle's breach of fiduciary duty claims.

## I.     BACKGROUND

In 1999, over two hundred Native American farmers and ranchers filed a class-action suit against the United States Department of Agriculture, contending that the Department discriminated against Native American applicants in their claims for credit and benefits under various government programs. Plaintiffs alleged violations of the Equal Credit Opportunity Act, the Administrative Procedure Act, and Title VI of the Civil Rights Act of 1964. In 2001, the District Court found that the plaintiffs had satisfied the requirements of Rule 23(b)(2), and certified a class of

> [a]ll Native–American farmers and ranchers, who (1) farmed or ranched between January 1, 1981 and November 24, 1999; (2) applied to the [the Department] for participation in a farm program during that time period; and (3) filed a discrimination complaint with the [the Department] individually or through a representative during the time period.

*Keepseagle v. Veneman*, No. 99-cv-3119, 2001 WL 34676944, at \*6 (D.D.C. Dec. 12, 2001). The District Court declined to decide whether certification under Rule 23(b)(3), for monetary relief, was appropriate at the time. *Id.* at \*14. However, the court noted that it "maintain[ed] the power to revisit the definition of the class at any point." *Id.*

## A. *The Initial Settlement*

After more than a decade of extensive discovery practice, the parties reached agreement in 2010 and drew up a settlement agreement for the District Court's approval. *See* Motion for Preliminary Approval of Settlement, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Oct. 22, 2010), ECF No. 571. The proposed Settlement Agreement provided both programmatic and monetary relief. *See* Settlement Agreement §§ IX, XII, Judicial Appendix ("JA") 405–23, 424–29. The programmatic relief included establishing the Council for Native American Farming and Ranching, requiring the Department to collect and evaluate data pertaining to its Farm Loan Program, and enhancing services and education for Native American farmers and ranchers. *Id.* § XII, JA 424–29. To provide monetary relief, the Agreement sought certification of a Rule 23(b)(3) opt-out class. *Id.* § IV(A), JA 400. The Agreement established a $680 million compensation fund financed by the Department of the

Treasury. *Id.* § VII(F), JA 403. Under an administrative claims process set forth in the Settlement Agreement, claimants would receive either $50,000, if they had "substantial evidence" of certain circumstances required in the Agreement, or up to $250,000, if they met a higher evidentiary standard. *See id.* § II(SS), (VV), JA 398 (setting out the dollar amounts of awards); § IX, JA 405–23 (outlining the non-judicial claims process). Claimants were given 180 days from the effective date of the agreement to submit their claims. *Id.* § II(B), JA 392. Some funds were also allocated to the named class representatives as "service awards." *Id.* § XV(C), JA 433–34.

In the event that the $680 million compensation fund was not exhausted during the claims process, the Agreement contained a *cy-près* provision. *Id.* § IX(F)(7), JA 422–23. That provision created a "Cy Pres Fund," defined as "a fund administered by Class Counsel designated to hold any leftover funds" from the claims process. *Id.* § II(J), JA 393. The Cy Pres Fund was to be distributed in equal shares to *cy-près* beneficiaries designated by class counsel. *Id.* § IX(F)(7), JA 422–23. The Agreement limited *cy-près* beneficiaries to "any non-profit organization, other than a law firm, legal services entity, or educational institution" that served Native American farmers. *Id.* § II(I), JA 393.

The Agreement also contained a provision permitting modification of the settlement, but "only with the written agreement of the Parties and with the approval of the District Court, upon such notice to the Class, if any, as the District Court may require." *Id.* § XXII, JA 438. The Agreement defined "Parties" as "the Plaintiffs and the Secretary," and "Plaintiffs" as "the individual plaintiffs named in *Keepseagle v. Vilsack*, . . . the members of the Class, and the Class Representatives." *Id.* § II(DD), (EE), JA 396.

The District Court received thirty-five letters objecting to the proposed Agreement. *See* Notice of Filing Objections and Opt Out Requests, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Mar. 18, 2011), ECF No. 585. Neither Appellant Mandan nor Appellant Tingle submitted objections. Three letters related to the Cy Pres Fund: one objector offered up organizations he had started as potential *cy-près* beneficiaries, *id.* at Exhibit 2; another recommended that *cy-près* awards be used for outreach to farmers, *id.* at Exhibit 33; a third cautioned that it was "simply wrong" to distribute remaining funds to *cy-près* beneficiaries "as determined by class counsel," *id.* at Exhibit 32.

Class counsel responded to the objections in a motion seeking final approval of the settlement, and the District Court held a fairness hearing on April 28, 2011. The District Court found that the terms of the settlement were fair and reasonable and adequate pursuant to Rule 23(e), and approved the Agreement. *See* Order, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Apr. 28, 2011), JA 589–91. The District Court entered final judgment dismissing the case, but retained continuing jurisdiction for five years for the limited purposes of overseeing compliance with the programmatic relief and the administrative claims process. *See* Final Order and Judgment, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Apr. 29, 2011), JA 592–93. No party appealed from the District Court's final order.

The administrative claims process proved to be less than satisfactory. Far fewer people made claims than anticipated. At the conclusion of the claims process, only $300 million of the $680 million settlement fund had been paid out. Although the Agreement originally directed the remaining $380 million to be distributed to *cy-près* beneficiaries, class counsel informed the District Court that such a large *cy-près* disbursement was

"not contemplate[d]" by the original Agreement and would be "impractical." Status Report at 4–5, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Aug. 30, 2013), ECF No. 646. The parties agreed to confer over possible solutions.

**B.** *The First Modification Attempt*

In September 2014, class counsel filed an unopposed motion to modify the Settlement Agreement, citing Rule 60(b)(5) and the modification clause of the Agreement. *See* Plaintiffs' Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Sept. 24, 2014), ECF No. 709. Counsel proposed to act promptly to distribute $38 million of the leftover funds to non-profit organizations, and to use the remaining $342 million to create a trust that would distribute the latter sum, over 20 years, to non-profit organizations serving Native Americans. While class counsel and the Department agreed to the proposed modification, one of the class representatives – Marilyn Keepseagle – did not, and filed her own motion to modify the settlement. *See* Marilyn and George Keepseagle's Motion to Modify the Settlement Agreement, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. May 19, 2015), ECF No. 779. Keepseagle proposed a *pro rata* distribution of the leftover funds to the successful claimants – a supplemental payment of around $100,000 each. The District Court held a hearing at which many class members testified in support of Keepseagle's proposal. Neither Appellant Tingle nor Appellant Mandan testified.

The District Court denied both class counsel and Keepseagle's motions to modify. *See Keepseagle v. Vilsack*, 118 F. Supp. 3d 98 (D.D.C. 2015), JA 1098–1167 ("First Modification Decision"). The court found that neither class counsel nor Keepseagle had met the requirements of Rule 60,

in part because, in the court's view, the larger-than-expected remaining funds did not constitute "truly changed circumstances" warranting relief. *Id.* at 55–62, JA 1152–59. The court also found that class counsel's motion did not have the "agreement of the Parties," as required by the modification clause, because Keepseagle, a class representative, opposed the motion. *Id.* at 67–68, JA 1164–65. The District Court implored all parties to continue negotiating. *Id.* at 69, JA 1166.

## C. *The Second Modification Attempt*

Class counsel, the Department, and Keepseagle reached a compromise in December 2015, and submitted a motion to amend the Agreement pursuant to the modification clause. *See* Plaintiffs' Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Dec. 14, 2015), ECF No. 824. The proposed compromise provided for an additional $18,500 payment to each of the 3,605 successful claimants and a corresponding payment to the Internal Revenue Service on each claimant's behalf. *See* Memorandum Opinion at 8, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Apr. 20, 2016), JA 1454 ("Second Modification Decision"). Then, $38 million would be promptly distributed to non-profit organizations proposed by class counsel and approved by the District Court. After the named representatives received additional "service awards" for their work in negotiations, the remaining funds (estimated to be $265 million) would be placed in a trust, to be paid out over twenty years, as contemplated by class counsel's previous motion.

The District Court directed class counsel to provide notice of the proposed modification to the class, reviewed written comments from class members, and held a hearing on February 4, 2016, at which many class members testified.

Appellant Tingle wrote in opposition, claiming that the trustees of the proposed trust would enrich themselves instead of benefiting class members. *See* Letter from D. Craig Tingle (Jan. 4, 2016), JA 1201–02. Appellant Mandan also filed a letter with the District Court, arguing that the remaining funds should all go to successful claimants, who are "easily identifiable," and not to "third parties who have not suffered any injury and who have no claims against the United States." *See* Comments of Class Representative Keith Mandan (Jan. 20, 2016), JA 1197–99. Appellant Mandan also filed a separate submission arguing that the District Court could not approve the proposed modification without his assent, because the modification clause requires the "agreement of the Parties." Points and Authorities of Law at 1, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Feb. 11, 2016), ECF No. 851. Appellant Mandan's objection cited the District Court's decision rejecting the first proposed modification and claimed that his objection presented "the same issue" as Keepseagle's objection. *Id.* at 3.

Counsel for Appellant Mandan, and Appellant Mandan himself, testified in support of fully distributing the remaining funds to successful claimants. *See* Tr. of Mot. Hr'g Proceedings at 68–74, 175, JA 1270–76, 1377. At the February 4, 2016 hearing, District Court Judge Sullivan, who had been presiding over the case, asked Appellant Mandan's counsel about a separate lawsuit that he had filed on behalf of a different class member, William Smallwood. *Id.* at 21, JA 1223. Judge Sullivan noted that three days earlier, on February 1, 2016, Appellant Mandan's counsel had filed a complaint in the District Court challenging the legality of the proposed *cy-près* distribution. *Id.* Judge Sullivan stated that the complaint was initially marked as "related" to the *Keepseagle* proceeding, but had been reassigned to Judge Walton because the complaint

challenged the initial settlement agreement, the merits of which were resolved in 2011. *Id.* at 21–22, JA 1223–24.

Even though the matter had not been raised in the *Keepseagle* proceeding, Judge Sullivan responsibly invited counsel to offer his views on whether Smallwood's challenges to the legality of the *cy-près* provision should be heard by the District Court in the *Keepseagle* proceeding as a related case. *Id.* at 22, JA 1224. Counsel declined this invitation, stating that he was "completely satisfied with where the case sits at this particular point." *Id.* at 70, JA 1272. Thereafter, counsel never raised, briefed, or otherwise pressed any legal challenges to the *cy-près* provision in the *Keepseagle* proceeding, and the District Court did not further address it. In the separate case, Judge Walton granted the Department's motion to dismiss for lack of standing on January 30, 2017. *Smallwood v. Yates*, No. 16-cv-161, 2017 WL 398334 (D.D.C. Jan. 30, 2017). An appeal was filed in that case on April 12, 2017.

The District Court approved the proposed compromise modification on April 20, 2016. *See* Second Modification Decision, JA 1447–75. The District Court declined to construe the original Agreement's modification clause "to require unanimous consent of the class representatives." *Id.* at 19, JA 1465. The District Court also determined that the proposed modification was "fair, reasonable, and adequate," as required by Rule 23(e)(2). *Id.* at 19–27, JA 1465–73. Appellants Tingle and Mandan now appeal the District Court's grant of class counsel's motion to modify the settlement.

## II.  ANALYSIS

### A.  *Standard of Review*

We review the District Court's interpretation of the terms of the Settlement Agreement *de novo*. *See Nix v. Billington*, 448 F.3d 411, 414 (D.C. Cir. 2006). And we review the District Court's approval of the modification to the Settlement Agreement for abuse of discretion. *See Pigford v. Johanns*, 416 F.3d 12, 16 (D.C. Cir. 2005).

### B.  *The District Court's Interpretation of the Modification Provision*

The District Court correctly interpreted the modification provision in the Agreement because a "reasonable person in the position of the parties" would not have thought that the provision requires unanimous approval by class representatives. *See Richardson v. Edwards*, 127 F.3d 97, 101 (D.C. Cir. 1997). The modification provision states that the Agreement "may be modified only with the written agreement of the Parties." Settlement Agreement § XXII, JA 438. We find that "written agreement of the Parties" cannot reasonably be construed, as Appellant Mandan urges, to require the *unanimous* assent of class representatives.

"We interpret a settlement agreement under contract law." *Gonzalez v. Dep't of Labor*, 609 F.3d 451, 457 (D.C. Cir. 2010) (citing *T Street Dev., LLC v. Dereje & Dereje*, 586 F.3d 6, 11 (D.C. Cir. 2009)). We must first "determine whether the disputed language is unambiguous." *Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265, 278 (D.C. Cir. 2014). If we find that the relevant clause is subject to more than one reasonable interpretation, we consider "what a reasonable person in the position of the parties would have thought the

disputed language meant." *Id.* (quoting *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006)).

We acknowledge that "the written agreement of the Parties" is ambiguous because "agreement" is reasonably susceptible to more than one construction. Nevertheless, in the context of this class action settlement, we do not believe that agreement means *unanimous* agreement, because such an interpretive gloss would yield absurd results. *See United States v. Winstar Corp.*, 518 U.S. 839, 907 (1996) (avoiding interpretation of contract that "would be absurd"); *Am. First Inv. Corp. v. Goland*, 925 F.2d 1518, 1521 (D.C. Cir. 1991) (avoiding interpretation that would "produce an absurd result").

The Agreement defines "Parties" as "the Plaintiffs and the Secretary," and defines "the Plaintiffs" as "the individual plaintiffs named in *Keepseagle v. Vilsack*, . . . the members of the Class, and the Class Representatives." Settlement Agreement § II(DD), (EE), JA 396. The terms of the Agreement allow modification upon the written agreement of the individual plaintiffs named in *Keepseagle v. Vilsack*, the members of the Class, the Class Representatives, and the Secretary. *Id.* § XXII, JA 438. If "agreement" were construed to require unanimous assent, the Settlement Agreement could be modified only if every single class member – upwards of thousands of people – assented. There is no good reason to believe that the parties intended to impose such a stringent barrier to modification. The modification provision would become meaningless, which would make little sense. *See Beal Mortg., Inc. v. FDIC*, 132 F.3d 85, 88 (D.C. Cir. 1998) (describing "the cardinal interpretive principle that we read a contract to give meaning to all of its provisions" (citations and internal quotation marks omitted)). In order to avoid such an absurd construction and to give effect to the parties' intentions,

we reject the argument that "the agreement of the Parties" was meant to require unanimity.

Furthermore, a central interpretive goal "in construing a contract is to give effect to the mutual intentions of the parties." *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 681 (D.C. Cir. 1985). To effectuate the parties' intent, we must consider the "context." *Id.* at 681 n.10. Here, it is noteworthy that the Agreement resolved a class action. "Class actions are a form of representative litigation. One or more class representatives litigate on behalf of many absent class members, and those class members are bound by the outcome of the representative's litigation." WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 1:1 (5th ed. 2016). Various class action procedures protect class members from being taken advantage of by class representatives, including the requirement that class representatives "fairly and adequately protect the interests of the class," FED. R. CIV. P. 23(a)(4), and the requirement that a court ensure that any settlement is "fair, reasonable, and adequate," FED. R. CIV. P. 23(e)(2).

These structural protections for class members diminish the need for unanimous decisionmaking in a class action. Requiring unanimity among class members, apart from being virtually impossible to achieve in a case of this sort, also invites gamesmanship by giving any class member the power to "hold out" and threaten to veto to seek a payoff. *See* Elizabeth Chamblee Burch, *Group Consensus, Individual Consent*, 79 GEO. WASH. L. REV. 506, 508 (2011) ("The holdout problem arises when defendants condition settlement on nearly unanimous consent . . . . [A hold out] threatens to derail the entire deal unless those claimants receive a disproportionately high payoff."). With these considerations in mind, we conclude that the modification provision, read in context – an Agreement

resolving a representational proceeding – permits amendment of the Agreement without unanimous assent.

Finally, we can discern no good reason why the parties would require unanimity to *modify* the Settlement Agreement, when unanimity was not required to *approve* the settlement in the first instance. As we noted in *Thomas v. Albright*, 139 F.3d 227, 232 (D.C. Cir. 1998), "a settlement can be fair even though a significant portion of the class and some of the named plaintiffs object to it." Indeed, in this case, the District Court approved the original settlement over the objections of thirty five class members. We doubt that the parties intended for modification to be more difficult than approval. Thus, the District Court correctly found that

> [j]ust as it could not reasonably have been the intent of the parties to construe the modification provision to require the consent of all class members to any modification, it also could not reasonably have been the intent of the parties to construe the modification provision to require the unanimous consent of the class representatives.

Second Modification Decision at 19, JA 1465.

We are not persuaded by Appellant Mandan's one argument to the contrary. He claims that the District Court was bound by its decision rejecting the first modification proposal because it was the "law of the case." Br. for Mandan at 48. This claim is simply mistaken. The District Court's initial decision was not binding because it was not embodied in any final judgment. "When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court." *LaShawn A. v.*

*Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (citation and internal quotation marks omitted). However, the law-of-the-case doctrine "does not apply to interlocutory orders . . . for they can always be reconsidered and modified by a district court prior to entry of a final judgment." *First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 620 (8th Cir. 2007) (citation omitted).

## C. *The District Court's Fairness Determination*

The District Court reasonably determined that the modified agreement was fair, reasonable, and adequate. Appellants have not met their "burden on appeal of making a 'clear showing' that an abuse of discretion has occurred" in the District Court's approval of the modified settlement. *Pigford v. Glickman*, 206 F.3d 1212, 1217 (D.C. Cir. 2000) (quoting *Moore v. Nat'l Ass'n of Sec. Dealers*, 762 F.2d 1093, 1107 (D.C. Cir. 1985)).

The record reveals that the District Court conducted an impressive and thorough review of the proposed addendum. The District Court "directed class counsel to provide the class with notice of the proposed Addendum, allowed class members to submit written comments to the Court, and scheduled a hearing . . . to hear argument from counsel and oral statements from class members." Second Modification Decision at 11, JA 1457. During an eight-hour hearing in the ceremonial courtroom, which was used to accommodate the large number of class members present, the District Court heard testimony from over thirty class members. *See* JA 1203–1437 (transcript of hearing).

Following the hearing, the District Court concluded that the proposed addendum was a fair compromise. The addendum reformed the *cy-près* distribution provisions, which all parties agreed were unworkable. The initial Settlement Agreement

required an equal distribution of funds to a restricted class of non-profit organizations approved by class counsel; the addendum eliminated the equal distribution requirement and expanded the class of non-profits eligible for the funds. *See* Plaintiffs' Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions at 6–8, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Dec. 14, 2015), ECF No. 824. Most notably, the addendum placed the bulk of the *cy-près* funds in a trust overseen by trustees with "substantial knowledge of agricultural issues, the needs of Native American farmers and ranchers, or other substantive knowledge relevant to accomplishing the Trust's Mission." Trust Agreement § 13(f)(1), *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Dec. 14, 2015), ECF No. 824-3. And, rather than distributing all of the funds at once, the addendum established a process for the trust to be paid out over 20 years. *Id.* § 10. As the District Court explained, these reforms, which offered greater flexibility and expertise in the management and distribution of funds, were necessary because of the "unexpectedly large amount of remaining funds." Second Modification Decision at 25–26, JA 1471–72.

The addendum also reflected a compromise regarding additional payments to class members who recovered in the first claims process. The two contending groups – one favoring distribution of all remaining funds to successful claimants, and one favoring no additional distribution – conceded to a middle ground: a limited distribution to successful claimants. The compromise provided for an additional $18,500 payment to successful claimants as well as a direct payment to the Internal Revenue Service to cover tax liability. As the District Court recognized, "[w]hile the amount of the payment is not as high as the class representatives and many class members would prefer, it is an additional payment that was not contemplated in the existing Agreement." *Id.* at 25, JA 1471.

As we have previously noted, "[a] claim that individual dissenters are entitled to more money is not, by itself, sufficient to reject the overall fairness of the settlement; . . . a settlement necessitates compromise." *Thomas*, 139 F.3d at 232. We have no good reason to second-guess the District Court's conclusion that, in providing both supplemental payments and reforming the *cy-près* process, the negotiated compromise fairly balances the parties' competing positions.

Appellant Mandan raises several procedural challenges to the District Court's fairness determination. He argues that the District Court erred by failing to recognize that it had the "equitable power" to distribute all of the funds marked for *cy-près* beneficiaries to the prevailing claimants. Br. for Mandan at 32–35. In a related argument, Appellant Mandan claims that the District Court should not have approved the modified settlement "without first determining whether the prevailing claimants were readily identifiable and whether further distributions to them were economically viable." *Id.* at 35 (capitalization altered). Appellant Mandan's final procedural challenge is that the District Court did not provide a "reasoned explanation" for its approval of the modified settlement. *Id.* at 42. We find no merit in these claims.

*First*, the District Court was correct in finding that it was not authorized "to fashion a different resolution such as ordering that the remaining funds be paid to prevailing claimants," Second Modification Decision at 24, JA 1470, because the District Court's jurisdiction was limited to accepting or rejecting the proposed settlement agreement that was before it. "[D]istrict courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees, but are instead constrained by the terms of the decree and related order." *Pigford v. Veneman*, 292 F.3d 918, 924 (D.C. Cir.

2002). In a previous decision in this case, we said: "The District Court's jurisdiction is drawn exceedingly narrowly . . . ." *Keepseagle v. Vilsack*, 815 F.3d 28, 36 (D.C. Cir. 2016). We recognized that the Agreement grants ongoing jurisdiction to the District Court only for specifically delineated, and narrow, circumstances, none of which apply here. Settlement Agreement § XIII, JA 429–30. District courts do not have freewheeling jurisdiction to modify settlements. "Who would sign a consent decree if district courts had free-ranging interpretive or enforcement authority untethered from the decree's negotiated terms?" *Pigford*, 292 F.3d at 925.

*Second*, the District Court did not err in approving the addendum without determining whether the prevailing claimants were identifiable and whether paying out funds to them was feasible. As discussed above, this argument misconceives the role and authority of the District Court, which is very limited. Appellant Mandan's argument also misreads our case law. There is no precedent in this circuit to support the assertion that parties cannot negotiate a settlement providing for *cy-près* distribution where prevailing claimants are identifiable and dispersal of funds is feasible. In support of this claim, Appellant Mandan cites *Democratic Central Committee of the District of Columbia v. Washington Metropolitan Area Transit Commission*, 84 F.3d 451 (D.C. Cir. 1996). However, the decision in that case did not limit *cy-près* awards to situations where prevailing claimants are not easily identifiable. Rather, the decision merely stated a definition of *cy-près* – "permit[ting] such funds to be distributed to the 'next best' class when the plaintiffs cannot be compensated individually" – that "some courts have applied." *Id.* at 455. It does not limit *cy-près* distributions to certain prescribed circumstances.

The cases from other circuits cited by Appellant Mandan are inapposite. *See* Br. for Mandan at 38. Appellant Mandan primarily points to decisions in which district courts *sua sponte* made *cy-près* awards, not cases (like the one here) in which the parties' negotiated settlement agreement included a *cy-près* provision. Indeed, in a decision from the Third Circuit, the court explained that "a district court does not abuse its discretion by approving a class action settlement agreement that includes a *cy pres* component directing the distribution of excess settlement funds to a third party." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 172 (3d Cir. 2013). That decision distinguished cases in which the parties "agreed to" the *cy-près* distribution from cases in which trial courts imposed a *cy-près* distribution "over the objections of the parties." *Id.* at 172 n.7. This case falls in the former category because the Settlement Agreement includes a *cy-près* provision. *See* Settlement Agreement § IX(F)(7), JA 422–23.

The other cases cited by Appellant Mandan involving decisions from our sister circuits are also plainly distinguishable. *See, e.g.*, *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21 (1st Cir. 2012) (agreement gave district court full discretion to select recipients of *cy-près* fund); *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011) (*cy-près* beneficiaries were completely unrelated to the objectives of the class action); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185 (5th Cir. 2010) (agreement provided for appointment of special master to dispose of any remaining funds without any guidelines). All of these cases involved situations that are very different from this case.

*Finally*, Appellant Mandan's argument that the District Court failed to give a reasoned explanation for its acceptance of the addendum is belied by the record. As discussed above, throughout the extensive settlement process that was

supervised by the District Court, as well as in its opinion disposing of this case, the court showed admirable patience, fairness, and good judgment in weighing the competing proposals for modification. *See* Second Modification Decision at 25–27, JA 1471–73 (explaining the court's reasoning). We not only do not reverse the District Court, we applaud its good efforts in bringing this case to conclusion.

## D. *The Waived and Forfeited Claims Relating to the Appropriations Clause and the Judgment Fund Act*

The lawsuit in this case was filed in 1999. The parties reached settlement in 2010. The District Court approved the settlement in 2011. No appeal was taken by any party. And at no time during this twelve-year period did any party challenge the legality of the *cy-près* provision in the Agreement.

The initial Agreement contained a *cy-près* clause providing that "the Claims Administrator shall direct any leftovers funds to the Cy Pres Fund." Settlement Agreement § IX(F)(7), JA 422–23. Neither Appellant Mandan nor any other interested party objected to this provision. Quite the contrary, Appellant Mandan accepted the settlement and received a payout from the administrative claims process. *See* Comments of Class Representative Keith Mandan at 1 (Jan. 20, 2016), JA 1197 ("Keith Mandan, is both a Class Representative and a Prevailing Claimant . . . .").

Appellant Mandan (and other parties) had a second opportunity to challenge the legality of the *cy-près* provision in the Agreement during the first proceedings to modify the Agreement. At this point in the litigation, the claims process had concluded, leaving $380 million remaining to be directed to the *cy-près* fund. The issue regarding the distribution of funds pursuant to the *cy-près* provision was front-and-center at

this stage of the proceedings before the District Court. Yet, neither Appellant Mandan nor any other interested party raised any objection to the legality of the *cy-près* provision in the Agreement.

Appellant Mandan's third opportunity to challenge the legality of the *cy-près* provision came when the District Court considered the second proposal to modify the Agreement. Appellant Mandan contested the *cy-près* distribution, but he did not contest the legality of the *cy-près* provision. *See* Comments of Class Representative Keith Mandan at 3 (Jan. 20, 2016), JA 1199. Appellant Mandan's counsel clearly knew during the second modification proceeding that he could raise any constitutional or legal challenges to the *cy-près* provision. He knew because *he explicitly declined to pursue any such challenges*.

In February 2016, a few days before the District Court's fairness hearing concerning the second proposed modification, counsel for Appellant Mandan filed a new, separate lawsuit, on behalf of a different class member, challenging the legality of the *cy-près* provision. *See* Complaint, *Smallwood v. Lynch*, No. 16-cv-161 (D.D.C. Feb. 1, 2016), ECF No. 1. In that complaint, counsel for Appellant Mandan marked the case as related to the *Keepseagle* case, but the District Court determined that it did "not appear to be related within the meaning of our local rules." Tr. of Mot. Hr'g Proceedings at 22, JA 1224. However, at the February 2016 fairness hearing, Judge Sullivan, who was presiding over the *Keepseagle* proceeding, offered counsel for Appellant Mandan the opportunity to present his challenges to the legality of the *cy-près* provision. The District Court told counsel that the case "was reassigned to one of my colleagues, Judge Walton. He and I have not discussed this, and maybe I should have heard from counsel first as to whether the Court should keep the case and resolve it itself or not. I'm interested

in your views about that." *Id.* But Appellant Mandan's counsel refused Judge Sullivan's invitation to raise the issue and explicitly declined to present his argument to the District Court, stating that "we are completely satisfied with where the case sits at this particular point." *Id.* at 70, JA 1272. Judge Sullivan then told counsel that the case is "before Judge Walton, and so you can make your arguments to him." *Id.* at 71, JA 1273.

Counsel for Appellant Mandan thereafter argued before Judge Walton in the separate case challenging the legality of the *cy-près* provision. Judge Walton dismissed the complaint for lack of standing on January 30, 2017. *See Smallwood v. Yates*, No. 16-cv-161, 2017 WL 398334 (D.D.C. Jan. 30, 2017). The matter was never raised again in conjunction with the *Keepseagle* case until Appellant Mandan filed his appeal with this court. Judge Sullivan never had occasion to address the issue because Appellant Mandan's counsel *explicitly* declined to pursue the matter in this case. This procedural history, which Appellant Mandan did not mention in his briefs to this court, reveals that he knowingly declined to raise his claims with the District Court in the matter now under review in this court.

Appellant Mandan now advances, for the first time in this case, constitutional and statutory challenges to the Settlement Agreement's *cy-près* provision. He argues that the provision violates the Appropriations Clause, U.S. CONST. art. I, § 9, cl. 7, because it proposes to expend Treasury funds without a specific appropriation by Congress. Br. for Mandan at 21–32. And he contends that the provision violates the Judgment Fund Act, 31 U.S.C. § 1304(a)(3), because *cy-près* beneficiaries are "uninjured non-parties" who would not be able to recover judgments against the United States. Br. for Mandan at 26. In Appellant Mandan's view, these claims are inexorably tied together and they are presented together in his brief. *See, e.g.*,

*id.* at 19. As noted above, these claims were never raised with the District Court. We therefore decline to review the claims because they were waived or forfeited.

In *Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008), the Supreme Court explained why appellate courts should be loath to address issues that were not raised with the district court in the first instance:

> In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a *pro se* litigant's rights. See *Castro v. United States,* 540 U.S. 375, 381–383 (2003). But as a general rule, "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Id*., at 386. (SCALIA, J., concurring in part and concurring in judgment). As cogently explained:

> > "[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties. Counsel almost always know a great deal more about their cases than we do . . . ." *United States v. Samuels*, 808 F.2d 1298, 1301 (C.A.8 1987) (R. Arnold, J., concurring in denial of reh'g en banc).

554 U.S. at 243–44.

"Although jurists often use the words interchangeably," *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004), *waiver* is the "intentional relinquishment or abandonment of a known right," *United States v. Olano*, 507 U.S. 725, 733 (1993) (citation and internal quotation marks omitted), and "forfeiture is the failure to make the timely assertion of a right." *Id*. In this case, Appellant Mandan waived his claims and he forfeited any right that he might have had to raise the matters on appeal. Application of the waiver doctrine, alone, is sufficient to dispose of these issues.

Appellant Mandan explicitly waived his claims when his counsel told the District Court Judge that he did not wish to pursue any challenges to the *cy-près* provision. He did this after Judge Sullivan invited him to raise whatever concerns he had. "[A]fter expressing [a] clear and accurate understanding of the . . . issue, [Counsel] deliberately steered the District Court away from the question . . . . In short, [Counsel] . . . chose, in no uncertain terms, to refrain from interposing [any] 'challenge' [to the *cy-près* provision]." *Wood v. Milyard*, 132 S. Ct. 1826, 1835 (2012). In these circumstances, Appellant Mandan's claims regarding the legality of the *cy-près* provision were waived and they cannot be raised on appeal.

On the record before us, there is no doubt that Appellant Mandan *waived* his claims regarding the legality of the *cy-près* provision. Even if we take a different tack and consider whether Appellant Mandan forfeited (rather than waived) his claims, the result is the same. The case law is clear that he is foreclosed from belatedly challenging the legality of the *cy-près* provision for the first time on appeal because he never raised his claims with the District Court in the first instance.

"It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984). We have explained the reasons for this general principle: "Enormous confusion and interminable delay would result if counsel were permitted to appeal upon points not presented to the court below. Almost every case would in effect be tried twice under any such practice. While the rule may work hardship in individual cases, it is necessary that its integrity be preserved." *Id.* at 1084–85 (quoting *Johnston v. Reily*, 160 F.2d 249, 250 (D.C. Cir. 1947)).

Thus, under well-established law, a party forfeits a claim by failing to raise it below when the party "knew, or should have known" that the claim could be raised. *Laffey v. Nw. Airlines, Inc.*, 740 F.2d 1071, 1091 (D.C. Cir. 1984). In this case, Appellant Mandan knew, or should have known, that his constitutional and statutory claims could have been raised in 2011, when the District Court approved the Settlement Agreement containing the *cy-près* provision. Appellant Mandan does not dispute this.

By 2015, after the claims process concluded and the remaining funds were slated for *cy-près* distribution, there can be no doubt that Appellant Mandan was once again on notice of the opportunity to put forward his constitutional and statutory theories. As detailed above, during the February 2016 fairness hearing, Judge Sullivan offered counsel for Appellant Mandan the opportunity to present his legal challenges to the *cy-près* provision. Counsel expressly declined and thereafter never pursued the claims with the District Court in this case.

In light of this record, it would be extraordinary for an appellate court to address these claims for the first time on

appeal. As the Supreme Court said in *Greenlaw*, in "our adversary system . . . we follow the principle of party presentation. . . . [Appellate courts] should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties." 554 U.S. at 243–44 (citation and internal quotation marks omitted).

It does not matter that Appellant Mandan's belated claims involve constitutional issues. The doctrines of waiver and forfeiture apply to constitutional objections. *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 143 (1967) ("[I]t is . . . clear that even constitutional objections may be waived by a failure to raise them at a proper time . . . ." (citing *Michel v. Louisiana*, 350 U.S. 91, 99 (1955)); *see also Eli Lilly & Co. v. Home Ins. Co.*, 794 F.2d 710, 717 (D.C. Cir. 1986) (finding that "appellants waived their constitutional claims by failing to raise them on their initial appeal to this court"); *Yakus v. United States,* 321 U.S. 414, 444 (1944); ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.").

We would not only pervert the adversary process by addressing Appellant Mandan's newly raised claims, we would also be required to engage in unduly weighty and cumbersome decision-making without a decent record from the District Court. *See Air Florida, Inc.*, 750 F.2d at 1085 (pointing out the "serious problems" that would be encountered if the court entertained complex issues on appeal "without prior consideration by the trial court").

Appellant Mandan's theories are novel and they rest on his view of legislative history that is beyond the record of this case.

*See* Br. for Mandan at 26–29 (citing, *e.g.*, *Proposal to Expedite the Payment of Judgments against the United States*: *Hearing Before the Subcomm. of the Comm. on Appropriations*, 84th Cong. 883 (1956)). While some of Appellees' briefs touch on the merits of some of Appellant Mandan's claims, *see, e.g.*, Br. for Appellee Vilsack at 19–24, we lack the robust record necessary to properly evaluate the substance of these arguments. Indeed, as far as we can discern, Appellant Mandan's arguments have never been addressed by any federal appellate court, and they have been explored only tangentially in a single law review article. *See* Paul F. Figley, *The Judgment Fund: America's Deepest Pocket and its Susceptibility to Executive Branch Misuse*, 18 U. PA. J. CONST. L. 145, 194–97 (2015).

Even giving Appellant Mandan the benefit of the doubt, we certainly cannot say that "the proper resolution [of his claims] is beyond any doubt." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). If anything, his arguments regarding the Judgment Fund Act appear to be misguided. *See* Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim, 13 Op. O.L.C. 98, 103 (1989) (focusing on the "underlying cause" leading to settlement, and not on the identity of the parties receiving settlement funds (citation omitted)).

Indeed, it is noteworthy that Appellant Mandan's arguments regarding the Judgment Fund Act stem principally from his policy concerns over the use of *cy-près* provisions, and not from any clear statutory mandate. *See, e.g.*, Br. for Mandan at 28–29 ("*Cy pres* is a troublesome concept generally."). "This being so, injustice [is] more likely to be caused than avoided" if this court were to address the issues in the first instance before they have been properly raised and tried in the District Court. *Singleton*, 428 U.S. at 121.

Given the novelty and complexity of Appellant Mandan's claims, the materials that he asks us to review, and the policy arguments that he raises, it would be entirely inappropriate for this court to address the merits of his claims without the benefit of a full record, including a decision from the District Court in the first instance. As then-Judge Scalia explained,

> [t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them. . . . Failure to enforce this requirement will ultimately deprive us in substantial measure of that assistance of counsel which the system assumes—a deficiency that we can perhaps supply by other means, but not without altering the character of our institution.

*Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983); *see also Hormel v. Helvering*, 312 U.S. 552, 556 (1941) ("[It] is essential . . . that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide . . . ."). Departing from our established "principle of party presentation" would deprive the parties of a full opportunity to present their arguments and would place this court in the unsuitable position of deciding novel legal issues in the first instance. This is not our role.

We understand that, in "exceptional circumstances," an appellate court may exercise discretion to address an issue that is subject to *forfeiture*. *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992). The Supreme Court said as much in *Singleton*, 428 U.S. at 121. But the Court made it clear that this is the exception, not the rule, and it should be limited to situations "as where the proper resolution is beyond any doubt," or where "injustice might otherwise

result." *Id.* (citation omitted). The record in this case does not come close to establishing exceptional circumstances that would militate in favor of this court considering, in the first instance, Appellant's legal challenges to the *cy-près* provision.

The truth here is that the "exceptional circumstances" exception to forfeiture is of little moment in this case because, before the District Court, Appellant Mandan *explicitly waived* the claims that he now seeks to raise with this court. And contrary to what the dissent implies, there is no authority to support a suggestion that Appellant Mandan's Appropriations Clause claims raise an Article III concern or call into question the jurisdiction of this court. The simple point here is that Appellant Mandan's Appropriations Clause claims were waived before the District Court and that is the end of the matter.

## E. *Appellant Tingle's Arguments*

Appellant Tingle's arguments overlap significantly with Appellant Mandan's, and are unpersuasive for the reasons discussed above. However, Appellant Tingle raises two unique arguments: first, that "[c]lass counsel had a conflict of interest and breached its fiduciary duty," Br. for Tingle at 30; and, second, that "[t]he class representatives breached their fiduciary duties," *id.* at 35. We reject both claims because Appellant Tingle offers no evidence in support of his allegations. He asserts that "divergent interests emerged within the class" such that class counsel "was simultaneously representing clients with conflicting interests." *Id.* at 31. He does not explain what those divergent interests were and how they resulted in breaches of fiduciary duties. Class representatives often must weigh competing claims in weighing the best interests of the class as a whole. This, without more, does not give evidence of a breach of fiduciary

duties. Likewise, Appellant Tingle alleges that trusteeships overseeing the proposed trust were promised to certain class representatives "to incentivize a change in position." *Id.* at 36. Nothing in the record supports this accusation. Lastly, Appellant Tingle takes aim at the "incentive fees" (or service awards) provided by the Agreement for the class representatives' work in negotiating the Agreement and its modification. *Id.* at 37. However, "incentive awards have often been used to compensate a class representative," *Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015), and nothing in the record of this case suggests that the service awards served any nefarious purposes.

### III.  CONCLUSION

For the reasons set forth above, we affirm the judgment of the District Court.

WILKINS, *Circuit Judge*, concurring:  I join the majority opinion in its entirety.  I write separately to emphasize a few brief points.

The dissent spins a tale of corruption and conspiracy, in which the plaintiffs and the Government were complicit in bilking the nation's taxpayers to pay a political ransom.  While this narrative may have been advanced in news accounts and scholarly articles, most of those statements and opinions have not been validated by the solemnity of the oath and "testing in the crucible of cross-examination," *Crawford v. Washington*, 541 U.S. 36, 61 (2004); nor are they found in the record, and it is the record upon which our decision must be based. Fed. R. App. P. 10(a).

What the record shows is that the District Court expressly found that the settlement "was attained following an extensive investigation of the facts and the law . . . [and] resulted from vigorous arms'-length negotiations, which were undertaken in good faith."  Order, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Apr. 28, 2011), JA 589-91.  Unless we find clear error in the District Court's conclusion – and even the dissent does not claim to do so – that finding stands.

It is true that more than half of the settlement fund was not distributed through the claims process and is now poised to be distributed via the *cy-près* provision.  But this was an unanticipated state of affairs, not an intended result.  *See Keepseagle v. Vilsack,* 118 F. Supp. 3d 98, 102 (D.D.C. 2015) ("[N]o one anticipated such a large amount of excess funds."). As represented to the District Court, "the parties contemplated that no more than several million dollars in settlement funds would be unclaimed," based on an expectation that "over ten thousand class members would likely file . . . claims, and that most of those claims would be successful."  J.A. 718 & n.2. Instead of 10,000 claims, only 5,191 were received.  J.A. 596.

The reason for this discrepancy is "unclear," *Keepseagle,* 118 F. Supp. 3d at 102, but the difference in the number of actual, versus estimated, claimants correlates closely with the amount of surplus settlement funds. The parties have offered several possible explanations, including that the deaths of eligible claimants (the claims process began 30 years after the first year covered by the settlement) left heirs with insufficient information to complete claim forms or that, perhaps, there were "simply fewer people with claims than Plaintiffs originally argued." *Id.* at 108 n.3. In addition to falling short of the expected number of claims, a large number of submitted claims were unsuccessful. Most strikingly, out of 146 Track B claimants, only fourteen were successful. *Compare* J.A. 596, *with* J.A. 716.

Regardless of the cause of this "monumental" failure in the claims process, *Keepseagle,* 118 F. Supp. 3d at 102, there is no occasion for considering the newly-resurrected claim that the *cy-près* provision – a feature of the Settlement Agreement since it was first unveiled seven years ago – violates the Appropriations Clause. The dissent apparently concedes that Appellant Mandan waived this claim before the District Court when he was asked whether he wished to pursue it. Yet, the dissent relies exclusively on cases involving *forfeiture* – not waiver – to argue that "exceptional circumstances" permit an appellate court to nevertheless consider the claim. The Supreme Court, though, has been clear: "Waiver is different from forfeiture." *United States v. Olano*, 507 U.S. 725, 733 (1993). While "[m]ere forfeiture . . . does not extinguish an error," waiver may. *Id.* (internal quotation marks omitted).

Of course, some errors cannot be waived – subject matter jurisdiction chief among them. In an attempt to shoehorn this case into that category, the dissent hints that a federal court may be without jurisdiction to approve a settlement agreement that

requires the Executive to make an unappropriated expenditure. No authority is cited for that proposition and the legal signposts in this area instead point in the opposite direction. *See Local No. 93 v. City of Cleveland*, 478 U.S. 501, 523 (1986) ("[T]he mere *existence* of an *unexercised* power to modify the obligations contained in a consent decree does not alter the fact that those obligations were created by agreement of the parties rather than imposed by the court."); *cf.* Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion, 23 Op. O.L.C. 126, 128 (1999) ("We do not believe . . . that Article III bars federal courts from entering consent decrees that limit executive branch discretion whenever such decrees purport to provide broader relief than a court could have awarded pursuant to an ordinary injunction.").

Even if the "extraordinary circumstances" standard cited in the dissent were applicable, its terms are not met. The dissent claims that the "proper resolution is not in doubt" because we are presented with a "fully briefed, purely legal question." *See* Dis. Op. at 16-17. But, of course, the proper resolution of even fully briefed, purely legal questions can be doubtful. Circuit splits happen.

Moreover, the question presented here is not purely legal. Congress has appropriated funds for the Executive to settle "claims . . . for defense of imminent litigation or suits against the United States . . . [which] shall be settled and paid in a manner similar to judgments in like causes." 28 U.S.C. § 2414. Concededly, the nonprofit organizations that will receive *cy-près* distributions out of leftover settlement funds may not possess any claims against the United States. But there is no denying that the Settlement Agreement did in fact settle claims against the United States; namely, the claims of the members of the class. The question of whether this settlement was supported by a congressional appropriation turns on whether

providing for *cy-près* distribution of unclaimed settlement funds is "similar to judgments in like causes." *Id.* That requires answering at least two questions that are not "purely legal": What are "like causes" to this one? And how are judgments in such causes settled and paid? The record offers no answers to these questions, nor should it, because Appellant Mandan told the District Court that this issue was off the table. Not only has there been no fact-finding on these questions, there has been no adversarial presentation; these questions are not "fully briefed." Nor can we say, without a proper factual record, that the proper resolution of the merits question is, in fact, "beyond any doubt," *Singleton v. Wulff*, 428 U.S. 106, 121 (1976).

These conclusions are not the product of "schadenfreude" or disrespect for the importance of separation of powers. Rather, they are mandated by a commitment to the proper role of the appellate court and the system of adversarial presentation. When properly presented in a case or controversy, courts vindicate the constitutional scheme of separation of powers. Otherwise, allegations of trespass onto Congress' constitutional curtilage must be addressed by Congress – not the courts – and Congress has ample weaponry with which to defend its turf.

BROWN, *Circuit Judge*, dissenting: $380,000,000 is, to use the late Senator Dirksen's wry phrase, "real money." That is what has been left on the table for private disbursement in this case. Perhaps one day, I will possess my colleagues' schadenfreude toward the Executive Branch raiding hundreds-of-millions of taxpayer dollars out of the Treasury, putting them into a slush fund disguised as a settlement, and then doling the money out to whatever constituency the Executive wants bankrolled. But, that day is *not* today.

The Constitution's Appropriations Clause ensures the People's elected representatives "hold the purse." *See* THE FEDERALIST NO. 58, p. 357 (Clinton Rossiter ed., 1961) (J. Madison). "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7. The Executive Branch may wish to favor certain interests on the taxpayer's dime. It may wish to use the Judicial Branch's enforcement of settlement agreements to avoid asking Congress for an appropriation. But the Constitution's design gives the People's elected representatives a means to thwart these "overgrown prerogatives." *See* THE FEDERALIST NO. 58, p. 357 (Clinton Rossiter ed., 1961) (J. Madison). By limiting the "judicial Power" to resolving "Cases" and "Controversies," U.S. CONST. art. III §§ 1–2, the Constitution ensures the Judicial Branch has "no influence over . . . the purse." *See* THE FEDERALIST NO. 78, p. 464 (Clinton Rossiter ed., 1961) (A. Hamilton). Expenditures toward the fulfilment of public policy are integral to policymaking itself, and policymaking is left to the legislature. *See id.* at 464, 467. In short, congressional control over the People's purse is a structural limit on both the Executive and Judicial Branches. *See Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring) ("Money is the instrument of policy and policy affects the lives of citizens. The individual loses liberty in a real sense if that instrument is not subject to traditional constitutional constraints.").

But this case exposes a peril to the public fisc with which the drafters never reckoned: *cy pres*. Originating from the law of trusts and estates, *cy pres* refers to a court's power to reform the terms of a trust or gift that is otherwise impossible to effectuate. Rather than revert the unclaimed money or gift back to the defendant, a court may distribute the unclaimed sum for a purpose "as near as possible" to the objectives underlying the trust or gift. *See generally* Martin H. Redish, Peter Julian & Samantha Zyontz, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617, 624 (2010) [hereinafter Redish]. *Cy pres* seeped its way into class actions after a 1972 article proposed that courts distribute unclaimed settlement dollars to whatever non-parties fulfill the litigation's "purpose." *See id.* at 631–32. *Cy pres* took the judiciary "to the utmost verge of the law" even before it was applied to class actions. *See Jackson v. Phillips*, 96 Mass. 539, 574 (1867) (quoting the English jurist Lord Kenyon). Now in "class action litigation," its mere presence raises "fundamental concerns" about the nature of judicial power. *See, e.g.*, *Marek v. Lane*, 134 S. Ct. 8, 8–9 (2013) (statement of Roberts, C.J., respecting denial of certiorari).

Here, Congress only appropriated money for the Executive Branch to pay settled claims against the United States via the Judgment Fund Act. *See* 31 U.S.C. § 1304(a) (Judgment Fund Act); *see also* 28 U.S.C. § 2414 (authorizing the Justice Department to pay settled litigation claims using funds appropriated via the Judgment Fund Act). Those claims have already been paid—every Native-American farmer who filed a viable claim of discrimination by the United States has been compensated. And yet, *more than half* of the Judgment Fund appropriation for this case—*more than $380,000,000*—remains. The Executive Branch and class counsel have devised

a *cy pres* distribution scheme to send these taxpayer dollars to "nonprofits" and "charities" with no claims against the United States. But, the Executive Branch and class counsel tell us not to worry. According to their distribution scheme, these unidentified non-parties fulfill the "purpose" of having "provided agricultural, business assistance, or advocacy services to Native American farmers," JA 393 (Original Settlement Agreement, II.I.), and are thus entitled to receive the remaining taxpayer money. Congress, however, never appropriated money for this expense.

Unfortunately, no party before the Court really cares what Congress authorized. *Cy Pres* gives the Executive Branch a win-win: By agreeing to a settlement amount that vastly overstated the claimants' monetary damages, the Executive can use a large dollar amount to reap the political benefits of photo-op compassion towards a discriminated minority group. At the same time, the Executive's agreement to an overstated damages sum ensures enough money is left in the fund to pay favored third parties after the claimants are compensated. *See, e.g.*, Paul F. Figley, *The Judgment Fund: America's Deepest Pocket and Its Susceptibility to Executive Branch Misuse*, 18 U. PA. J. CONST. L. 145, 200 (2015) (explaining that the *Keepseagle* settlement was part of an Obama administration strategy "to neutralize the argument that the government favors black farmers over . . . Native American[s] . . . and to court key constituencies") [hereinafter Figley, *The Judgment Fund*]. Class counsel gets a piece of the action too: By agreeing to *cy pres* distributions, the size of the settlement fund is inflated. The larger the settlement's size, the larger class counsel's fee award—regardless of how much of the settlement actually pays injured parties (better known as class counsel's *clients*). Even Appellant's protest of the *cy pres* scheme is not entirely altruistic. He wants the remaining money distributed to already-compensated class members, not returned to the U.S.

Treasury. In short, everyone apparently presumed a bloodied-shirt party could be thrown at the taxpayer's expense. Why risk Congress being a killjoy? *See generally* Sharon LaFraniere, *U.S. Opens Spigot After Farmers Claim Discrimination*, N.Y. TIMES, (Apr. 25, 2013), http://www.nytimes.com/2013/04/26/us/farm-loan-bias-claims-often-unsupported-cost-us-millions.html [hereinafter LaFraniere, *Spigot*].

Nevertheless, the Constitution's limitations on judicial power remain, even if "the parties" before a court "cannot be expected to protect" them. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986). Judicial restraint becomes judicial abdication when the parties keep making mistakes and we keep them from being corrected. *Cf.* 33 G.K. CHESTERTON, *The Blunders of Our Parties*, *in* THE COLLECTED WORKS OF G.K. CHESTERTON 312, 312–16 (1990). Like the Constitution's other structural features, "[n]either Congress nor the Executive can agree to waive" the Appropriations Clause. *See Freytag v. Comm'r*, 501 U.S. 868, 880 (1991). When the Constitution's "structural principle[s]" limiting judicial power are "implicated in a given case, . . . notions of consent and waiver cannot be dispositive." *Schor*, 478 U.S. at 850–51.

If the Government wishes to achieve certain purposes by expending taxpayer money to people with no monetary claims against the United States, a legislative appropriation is required. No such appropriation exists here. Neither authorizing nor policing a *cy pres* distribution scheme in a class action settlement with the United States is consistent with constitutional limitations. Because the money was appropriated to pay claims, and those claims have been compensated, the more than $380,000,000 that remains here should be returned to the American People. But, *cy pres* permits the judiciary to take more than half the taxpayer money

Congress authorized to pay claims in this case and appropriate the money for something else.  This is not justice.  It is not even law.  I respectfully dissent.

## I.

*The Constitutionality of Cy Pres Distributions Is Before Us*

The majority averts its gaze from the Constitution by invoking the waiver doctrine.  But waiver is not proper simply because "[q]uestions may occur which we would gladly avoid."  *Cf. Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (per Marshall, C.J.).  Waiver is a proper conclusion when we follow the doctrine's guideposts.  If those guideposts tell us "we cannot avoid" a difficult question, then we must "exercise our best judgment, and conscientiously . . . perform our duty."  *See id.*  Here, the waiver doctrine provides no security blanket keeping us from *cy pres*'s constitutional problems.

There are two primary reasons why waiver is inapposite here: (1) this case presents "exceptional circumstances;" and (2) this case raises structural, jurisdictional limitations on judicial power that cannot be waived.

Some background information is essential to grasping this case's exceptional circumstances and the structural constitutional limitations it raises:

The *Keepseagle* case is one of several class actions attempting to capitalize on successful litigation under the Equal Credit Opportunity Act ("ECOA"), where African-American farmers were treated unfairly in loan programs, crop payments, and disaster payments run by the U.S. Department of Agriculture.  Congress facilitated these cases by amending

ECOA's statute of limitations. *See* Stephen Carpenter, *The USDA Discrimination Cases:* Pigford, In re Black Farmers, Keepseagle, Garcia, *and* Love, 17 DRAKE J. AGRIC. L. 1, 15–16 (2012) (discussing the statute of limitations problem in *Pigford I*). The class litigation involving African-American farmers was incredibly successful—leading to, most notably, Congress appropriating a settlement payout of **$2,000,000,000** for resolving the *Pigford II* litigation. *See, e.g.*, Figley, *The Judgment Fund*, 18 U. PA. J. CONST. L. at 189–92 (detailing the African-American farmers' class litigation).

The success of the African-American class litigation owed more to politics than law. *See, e.g.*, *id.* at 193 ("President Bill Clinton and President Barack Obama favored the farmers' claims, and their political appointees actively supported the settlements over the objections of some career officials."); LaFraniere, *Spigot* (quoting Congressman Steve King, who explained Congress's appropriation by saying, "[n]ever underestimate the fear of being called a racist"). *But*, no matter how political the Executive's litigation strategy may have been, "the [settlement] payments were made in a manner that respected the Judgment Fund." Figley, *The Judgment Fund*, 18 U. PA. J. CONST. L. at 193. Congress "allowed" the African-American class litigation when it expanded ECOA's statute of limitations, and it "appropriated money . . . with full knowledge of the terms of the agreement" settling *Pigford II*. *See id; see also* Todd David Peterson, *Protecting The Appropriations Power: Why Congress Should Care About Settlements at the Department Of Justice*, 2009 B.Y. U. L. REV. 327, 362 (2009) ("Rather than leaping over or subverting the limitations imposed by Congress's control over the circumstances in which money judgments may be obtained against the United States, the Department of Justice went to Congress for the appropriate authority before it settled the case.").

*Keepseagle*, however, has all of these political motivations but none of the respect for Congress's control over the purse. The Executive Branch neither sought a specific appropriation for this case, nor did Congress *ever* authorize the Executive to send taxpayer money appropriated for settled lawsuits to non-injured third-parties with no claims against the United States. *See* Figley, *The Judgment Fund*, 18 U. PA. J. CONST. L. at 194–97. Why, you may ask, would the Executive Branch avoid asking Congress for a specific appropriation for *Keepseagle*? Congress, in writing a multi-billion dollar appropriation for *Pigford II*, demonstrated its willingness to pay large sums to resolve discrimination claims against the United States. But, the difference with *Keepeseagle* is the purpose of the settlement. This settlement—as the more than $380,000,000 remaining for *cy pres* distribution now confirms—went far beyond compensating injured Native-American farmers; it sought to ensure favored "nonprofits" and "charities" were flushed with cash.[1]

---

[1] Even outside its *cy pres* provisions, the *Keepseagle* settlement is generally less focused on compensating class members—and more focused on enacting agriculture policy and compensating class counsel—than the *Pigford* consent decree. *See* Carpenter, *The USDA Discrimination Cases*, 17 DRAKE J. AGRIC. L. at 25–26 & n.261 (explaining that, unlike *Pigford*, the *Keepseagle* settlement provides for "programmatic relief" that will: create a Federal Advisory Committee called the Council for Native American Farming and Ranching; create sub-offices within the Agriculture Department on Indian Reservations; provide for a review of loan making within the Agriculture Department in consultation with class counsel; require the Agriculture Department to collect data regarding Native American farming loans to identify disparities; and create an Ombudsman that will address concerns of "socially disadvantaged" farmers and raise them with the Council. Class counsel also received a bigger benefit in *Keepseagle*—the settlement allows class counsel's fee award to come from a percentage of the common

As the majority acknowledges, when the *Keepseagle* class was first certified in 2001, it was certified *only* for injunctive relief—the district court deferred the question whether the class deserved monetary relief. *See Keepseagle v. Veneman*, 1:99-cv-03119, 2001 WL 34676944, at \*14 (D.D.C. Dec. 12, 2001). Yet the Judgment Fund does not apply to injunctive relief. Without class certification for monetary relief, a large settlement payout was impossible; the *Keepseagle* plaintiffs would have to individually litigate any claims for monetary damages. But the claims of the class claimants were quite facile, and individually-litigated cases are seldom as lucrative as class actions. *See* LaFraniere, *Spigot* ("Depositions had revealed many of the individual farmers' complaints to be shaky. And federal judges had already scornfully rejected the methodology of the plaintiffs' expert, a former Agriculture Department official named Patrick O'Brien, in the [female farmers'] case."); *see also Garcia v. Veneman*, 224 F.R.D. 8, 16 (D.D.C. 2004) ("The history of the *Pigford* (black farmers) class action litigation amply demonstrates that . . . it is the questions affecting only individual members that predominate."); Barry Sullivan & Amy Kobelski Trueblood, *Rule 23(f): A Note on Law and Discretion in the Courts of Appeals*, 246 F.R.D. 277, 279 (2008) ("Where a class is not certified, the plaintiffs (and their lawyer) may not have the will—or the resources—to continue with a litigation that [may] yield only a small recovery and little basis for an award of substantial attorneys' fees.").

---

settlement fund, rather than a flat fee credited against the class award). These arrangements gave class counsel an incentive to inflate the class claimants' damages, while incentivizing the Executive Branch to drop its strong legal arguments and settle in favor of enacting agriculture policy.

For most of this lawsuit's history, the Executive Branch was not helping class counsel out of this little conundrum. From the lawsuit's filing in 1999 to December 2009, the Executive Branch "hotly contested" the *mere existence* of monetary damages. *See Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 105–06 (D.D.C. 2015). Even after "nearly ten years" of "extensive and contentious discovery and motions practice," the Executive Branch insisted on the non-existence of money damages. *See id.* Discovery gave the Executive good reason to remain insistent—"this nearly decade-long battle resulted in a narrowing of the plaintiffs' claims." *See id.* In fact, in October 2009, the Executive Branch went so far as to tell the district court that the narrowing of Plaintiffs' "theory of the case and supporting law" was so "considerabl[e]" that it "call[ed] into question the previous class definition." *See* Gov't Mem. in Opposition to Plaintiffs' Mot. for Order Regarding the Establishment of Class Membership at 4, *Keepseagle v. Vilsack*, No. 1:99-cv-03119 (D.D.C. Oct. 23, 2009), ECF 541. Yet, a mere six weeks later, even as the deadline for the Executive Branch's submission of a rebuttal expert report on damages approached, the Justice Department agreed to stay the case—concluding that "settlement discussions are appropriate at this time." *See* Joint Mot. to Stay at 2, *Keepseagle v. Vilsack*, 1:99-cv-03119 (D.D.C. Dec. 3, 2009), ECF 548.

In late 2009, the Executive Branch went from disputing the existence of money damages to embracing a settlement agreement that pays the Plaintiffs "nearly 90%" of their "estimated total damages," $776,000,000, $680,000,000 of which came from the Judgment Fund. *See Keepseagle*, 118 F. Supp. 3d at 106. Given the $380,000,000 remaining from the Judgment Fund appropriation after class claimants were compensated, we now know Plaintiffs' money damage

estimates were wildly off-base.[2] Class counsel, though, received a $60,800,000 payday—roughly *four times* class counsel's actual expenses.[3] None of this should have surprised

---

[2] The dearth of class claimants that actually qualified to receive money damages confirms the inflation. As the Executive Branch acknowledges here, "[t]he claims process . . . allowed claimants to obtain substantial recoveries *by submitting minimal evidence*." Gov't Br. 27 (emphasis added). All that was required to "obtain $50,000 plus $12,500 in tax relief [under Track A]" was "a written statement without any further supporting documentation (save proof of Tribal membership, if applicable)." *Id.* at 27–28. Under Track B, a claimant could "obtain a cash payment of up to $250,000 by meeting a 'preponderance of the evidence' standard in an entirely non-adversarial process (meaning that any showing of discrimination went unrebutted even if the government could have rebutted the claim had it proceeded to litigation)." *Id.* at 28. Moreover, the Agriculture Department forgave any outstanding federal farm loan debt for any claimant that prevailed under either Track A or Track B, even if "the value of that debt relief far exceeded claimants' cash recoveries." *Id.* Short of giving the settlement money away without any process at all, it is difficult to see how the Executive Branch could have made it any easier for class members to collect. Nevertheless, only 3,601 individuals prevailed in this process—a sliver of the more than 19,000 claimants predicted by the class complaint. *See* Fifth Amended Class Action Complaint at 163 ¶ 143, *Keepseagle v. Vilsack*, No. 1:99-CV-03119, 2001 WL 35985330 (D.D.C. June 27, 2001).

[3] Even the Executive Branch could not, initially, swallow the size of class counsel's fee award. In contesting this award, the Executive Branch acknowledged it was willing to pay attorney fees that roughly *doubled* its estimate of class counsel's actual expenses to settle the case, but it was not comfortable paying what class counsel ultimately received. *See, e.g.*, Gov't Resp. to Pls.' Mot. for Att'y Fees and Expenses and to Pls.' Mot. for Approval of Class Representative Incentive Awards at 2, 7, *Keepseagle v. Vilsack*, No. 1:99-cv-03119 (D.D.C. Mar. 18, 2011), ECF No. 586; *see id.* at 9 ("It is possible

the Executive Branch. When it came before this Court to contest the deferral of class certification on monetary damages, the Justice Department said the following: "'This case is, at bottom, about compensatory relief for past wrongs,' *creating a threat of 'hydraulic' pressure to settle*" for a large sum. *See In re Veneman*, 309 F.3d 789, 794 (D.C. Cir. 2002) (quoting the Justice Department). Moreover, the Government's damages expert, Economics and Statistics Professor Gordon C. Rausser of the University of California, Berkeley, "produced a 340-page report stating that [Plaintiffs' expert's damages] conclusions were based 'in a counter-factual world' and that Native Americans had generally fared as well as white male farmers." LaFraniere, *Spigot.* "'If they had gone to trial, the government would have prevailed,' he said. 'It was just a joke,' he added. 'I was so disgusted. It was simply buying the support of the Native-Americans.'" *Id.* By settling, however, the Executive Branch never filed its rebuttal expert report.

Both the original settlement agreement and the addendum appealed here require court approval of the *cy pres* recipients class counsel will propose. *See* JA 393 (Original Settlement Agreement, II.I); JA 1170 (Proposed Settlement Agreement Addendum, II.A–B). Court approval is also required for the "awards" class counsel proposes that these *cy pres* recipients receive. *See* JA 423 (Original Settlement Agreement, IX.7); JA 1172 (Proposed Settlement Agreement Addendum, IV.A). No adjudicative standard is set forth for approving either the *cy pres* recipients or their distributions, other than that these recipients fulfill the "purpose" of having "provided agricultural, business assistance, or advocacy services to

---

that Plaintiffs' billing records provide adequate support for the claimed expenditures, but it is difficult to imagine, for example, how money spent on 'conferences' or 'media services' is a reasonable and necessary litigation expense at that time, and none of the travel expenses are justified or described beyond 'travel.'").

Native American farmers," *e.g.*, JA 393 (Original Settlement Agreement, II.I). The proposed addendum adds an equally-fraught twist: The "primary *cy pres* beneficiary" will be a newly-created "Native American Agriculture Fund." JA 1170 (Proposed Settlement Agreement Addendum, II.B). Class counsel will select the Trust Fund's Board of Trustees and its Executive Director, and a court will be tasked with approving those selections. *See id.*

Nothing prohibits class counsel from serving on the Trust Fund's Board (or as its Executive Director), nor is the Executive Branch in any way prevented from "suggesting" names for class counsel's nomination (nor, presumably, is a court so limited). Moreover, this Trust Fund will be tasked with using its taxpayer-funded *cy pres* money to, among other things, "educate the public on agricultural issues, the needs of Native American farmers and ranchers, and other matters related to the Trust's Mission, including by advocating for a particular position or viewpoint" (the Trust Fund does purport to be a non-political nonprofit, however). JA 1180.

The settlement agreement here strongly suggests its exorbitant sum is *not* the result of, as the Executive Branch preposterously contends, "the level of sophistication and effectiveness of the lawyers representing the class's interests[,] . . . as well as the legal backdrop against which the parties negotiated." Gov't Br. 23. Rather, political calculations explain the settlement. *Cf. Keepseagle*, 118 F. Supp. 3d at 104 (suggesting the Government settled this case because it "implicate[s] deep-seated interests of justice" even if "the government's legal defense may be relatively strong"). An internal memorandum within the Department of Agriculture from March 2010 says *Keepseagle* was part of an Obama administration effort "to neutralize the argument that the government favors black farmers over Hispanic, Native

American or women farmers." LaFraniere, *Spigot*; *see also id.* ("Sweeping settlements with the three groups, [Tony] West [Assistant Attorney General of the Justice Department's Civil Division], argued, would eliminate legal risks and smooth relations between the Agriculture Department and important constituencies."); Press Release, Agriculture Secretary Vilsack and Attorney General Holder Announce Settlement Agreement with Native American Farmers Who Claim to Have Faced Discrimination by USDA in Past Decades, Release No. 0539.10 (Oct. 19, 2010) https://www.usda.gov/wps/portal/usda/usdamediafb?contentid =2010/10/0539.xml&printable=true&contentidonly=true ("[S]hortly after [Secretary Vilsack] took office he sent a memo to all USDA employees calling for 'a new era of civil rights' for the Department. In February 2010, Secretary Vilsack announced the *Pigford II* settlement with black farmers; the *Keepseagle* settlement continues as part of that new era. Meanwhile, Secretary Vilsack continues to pursue the resolution of all claims of past discrimination against USDA."). Reporting also indicates "the payouts pitted [the Secretary of Agriculture] and other political appointees against career lawyers and agency officials, who argued that the legal risks did not justify the costs" to the taxpayer. LaFraniere, *Spigot*.

My colleague suggests we should ignore this case's context because it is not "found in the record." Concurrence at 1. Of course, *the district court* not only acknowledged this context—it expressed sympathy with the Executive Branch's preference for political largess over legal defense.[4] *See*

---

[4] Moreover, the insistence that we must be willfully blind to context unless it is "test[ed] in the crucible of cross-examination" is especially puzzling. Concurrence at 1. The context of this case is not examined to make a factual determination—it helps explain why "exceptional circumstances" exist to address Mandan's

*Keepseagle*, 118 F. Supp. 3d at 104 ("The statements of the President, Secretary Vilsack, and then-Attorney General Holder make clear that the government in 2010 understood this dimension of the case. . . . The government['s] [lawyers] would do well to remove [their] legalistic blinders."); *but see Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.LC. 126, 137 (1999) ("The Attorney General generally possesses the congressionally conferred power to settle on terms that would serve the best interests of the United States, but *the considerations and terms that inform and structure a settlement must be traceable, nonetheless, to a discernible source of statutory authority*." (emphasis added)) [hereinafter *Settlements Limiting the Future Exercise of Executive Branch Discretion*]. Despite the district court's obvious sympathy, it still questioned whether the Judgment Fund Act permitted a *cy pres* distribution:

> The result is that $380,000,000 of taxpayer funds is set to be distributed inefficiently to third-party groups that had no legal claim against the government. Although a $380,000,000 donation by the federal government to charities serving Native American farmers and ranchers might well be in the public interest, the [c]ourt doubts that the judgment fund from which this money came

---

constitutional arguments. It makes no sense to insist on a trial when, by design, "exceptional circumstances" are only invoked *on appeal* to consider an argument *not raised below*.

was intended to serve such a purpose. The public would do well to ask why $380,000,000 is being spent in such a manner.

*Keepseagle*, 118 F. Supp. 3d at 104. But the district court reasoned the parties' consent to the final judgment put the *cy pres* issue "beyond the realm of the law and into the realm of politics and policy." *Id*; *see also id.* at 121 ("[T]he [c]ourt is not persuaded that it has any authority to declare void portions of an agreement that was negotiated by the parties, approved by the [c]ourt pursuant to [Rule] 23, and finalized on appeal (either by affirmance of the Court of Appeals or by the lack of any timely appeal)."). In considering the *cy pres* amendment at issue here, both the district court and the majority continue to treat the parties' consent as a means to circumvent constitutional limitations on judicial power.

*A.*

*Exceptional Circumstances Are Present*

"[A] federal court is more than 'a recorder of contracts' from whom parties can purchase [relief]." *Local Number 93, Int'l Ass'n of Firefighters v. Cleveland*, 478 U.S. 501, 525 (1986). Congress did not create the Judgment Fund for the Executive to dispense political favors, but to pay lost or settled litigation claims against the United States. *See* 31 U.S.C. § 1304(a) (appropriating money "to pay final judgments, awards, [and] compromise settlements," and limiting that appropriation to when: payment is not authorized by another source; the Treasury Department has certified the payment; and "the judgment, award, or settlement is payable" under a statute Congress designated for such payment). "The Framers fully recognized that nothing would so jeopardize the legitimacy of

a system of government that relies upon the ebbs and flows of politics to 'clean out the rascals' than the possibility that those same rascals might perpetuate their policies simply by locking them into binding contracts." *U.S. Tr. Co. v. New Jersey*, 431 U.S. 1, 45 (1977) (Brennan, J., dissenting). Even the Executive Branch has acknowledged that, despite its "sweeping" power to settle lawsuits, "the Attorney General must, as a general matter, exercise her broad settlement discretion in a manner that conforms to the specific statutory limits that Congress has imposed upon its exercise." *Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.LC. at 136.

When exceptional circumstances are present, "the courts of appeals" possess "the discretion" to decide "what questions may be taken up and resolved for the first time on appeal." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). Exceptional circumstances are present when "the proper resolution is beyond any doubt, or where injustice might otherwise result." *Id.* (internal citation omitted). Here, such circumstances exist, justifying us in addressing Appellant's challenge to the settlement agreement's *cy pres* provisions.

*i.*

*The Proper Resolution Is Not In Doubt*

The Appellant, Keith Mandan ("Mandan"), argues that *cy pres* distribution violates the Appropriations Clause and the Judgment Fund Act. This is his lead argument within his opening brief. Both the Executive Branch and the Plaintiff-Appellees briefed this issue too. Moreover, the Executive Branch is right when it claims Mandan's argument challenges *cy pres* distributions in class action settlements with the United States *generally*—not just the *cy pres* distribution scheme proposed within the addendum to this settlement agreement.

*See* Gov't Br. 18; *cf.* Appellant Opening Br. 22–29. Poignantly, *the Executive Branch* set forth the proper remedy within its own brief. *See* Gov't Br. 24 ("If the remaining $3[8]0 million in taxpayer money indeed remains part of the public fisc and need not be distributed according to the terms of the 2011 settlement agreement, *then the most appropriate disposition of this unexpectedly large sum would be for it to revert to the Treasury*." (emphasis added)). This is, therefore, not a case where "the opposing party los[t] its opportunity to contest the merits," or where "an improvident or ill-advised opinion on the legal issues" is at risk. *See Se. Mich. Gas Co. v. FERC*, 133 F.3d 34, 42 n.3 (D.C. Cir. 1998). The result and issue are squarely raised before us.

"Deciding fully briefed, purely legal questions is a quotidian undertaking for an appellate court." *See Ass'n of Am. R.R. v. U.S. Dep't. of Transp.*, 821 F.3d 19, 26 (D.C. Cir. 2016). The concurrence claims the proper resolution of a fully briefed legal issue can still be in doubt, so "exceptional circumstances" cannot be invoked on that ground. *See* Concurrence at 3. This view does not follow from our precedent. *See Hodge v. Talkin*, 799 F.3d 1145, 1171 (D.C. Cir. 2015) ("The district court . . . did not reach Hodge's vagueness challenge. . . . Here, we find it appropriate to consider Hodge's vagueness claim. Not only does he ask us to address the challenge, but it raises pure questions of law. And the government joins issue with Hodge's arguments on the merits rather than suggesting that we forbear on the matter."). To be sure, the Executive Branch argues waiver. But as noted above, the Executive Branch also set forth a detailed response on the merits and identified the proper remedy. This is thus unlike the circumstance in which we declined addressing constitutional issues surrounding *cy pres*. *Cf. Democratic Cent. Comm. v. Wash. Metro. Area Transit Comm'n*, 84 F.3d 451, 455 n.2 (D.C. Cir. 1996) (declining to address the "controversial" use of *cy pres*

distributions in class actions against the United States because, unlike here, "[t]his case . . . is not a class action; the constitutional challenges mentioned above are not at issue here."). We cannot be transgressing our discretion by resolving this issue.

*ii.*

*Invoking Waiver Results In Injustice*

By failing to consider Mandan's *cy pres* challenge, we permit a fundamental injustice: *cy pres* allows the Executive Branch to circumvent checks on its own power with the Judicial Branch's imprimatur. The acceptability of circumventing the congressional appropriations process under the guise of Article III is "extraordinarily important and deserves a 'definitive answer.'" *See Al Bahlul v. United States*, 840 F.3d 757, 760 n. 1 (D.C. Cir. 2016) (en banc) (Kavanaugh, J., concurring) (quoting *Al Bahlul v. United States*, 767 F.3d 1, 62 (D.C. Cir. 2014) (en banc) (Brown, J., concurring in judgment and dissenting in part)). This issue raises the proper relationship of our Federal Government's three branches when dealing with the People's money. Moreover, "other cases in the pipeline require a clear answer to [this] question." *See id.* As Chief Justice Roberts recently noted, "[*c*]*y pres* remedies . . . are a growing feature of class action settlements." *Marek*, 134 S. Ct. at 9 (statement of Roberts, C.J., respecting denial of certiorari). Other legal commentators have also noted this trend. *See* Redish at 661 ("[T]he prevalence of class action *cy pres* awards has increased steadily by decade since the 1980s and has accelerated noticeably after 2000."). Additionally, *cy pres* distribution in this case is not merely dispensing a "residual" amount—it will dispose of *more than half* of this settlement fund. Even by *cy pres* standards (such as they are), this is exceptional. *See, e.g.*, *In re Baby Prods. Antitrust Litig.*,

708 F.3d 163, 174 (3d Cir. 2013) ("Barring sufficient justification, *cy pres* awards should generally represent a small percentage of [the] total settlement funds.").

In sum, if these circumstances are not exceptional, I do not know what defines "exceptional circumstances."

## *B.*

### *Structural Constitutional Objections Are Present*

The source of the "exceptional circumstances" here is its own basis for not invoking waiver: a "neither frivolous nor disingenuous" "constitutional challenge" to "the validity of the . . . proceeding that is the basis for th[e] litigation." *See Freytag*, 501 U.S. at 879. Specifically, the structural issue before us is the district court's power to approve and police a *cy pres* distribution scheme without congressional appropriation.

The fact that Mandan consented to the 2011 agreement is immaterial. "[C]onsent" cannot "excuse an actual violation of Article III," *see, e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1945 n.10 (2015), and that is what Mandan's Appropriations Clause claim presents. [5] We must be willing to

---

[5] Mandan does not detail the Appropriations Clause's implications for judicial power to the same extent he does for *cy pres* distributions under the Judgment Fund Act. Still, Mandan *does* fully brief the implications of *cy pres* distributions for the separation of legislative, judicial, and executive powers. *See, e.g.*, Appellant Opening Br. 22–29. We are thus well within our purview to detail the particular implications for judicial power. *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories

assess claims that the Judicial Branch acted with power entrusted to another branch of the Federal Government. *See Freytag*, 501 U.S. at 879 ("[T]he disruption to sound appellate process entailed by entertaining objections not raised below does not always overcome what Justice Harlan called 'the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers.'" (internal citation omitted)).[6]

Our Founders "lived among the ruins of a system of intermingled legislative and judicial powers." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995). Judges were under the King's thumb, while legislatures were often

---

advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (clarifying a panel is "*not* precluded from supplementing the contentions of counsel through [its] own deliberation[s] and research" (emphasis added)).

[6] The concurrence dismisses the cases saying structural, jurisdictional limitations on Article III are always before us, because those cases "involv[e] *forfeiture*—not waiver." Concurrence at 2. The concurrence says "[t]he Supreme Court . . . has been clear" on the difference between the two concepts. *See id.* I beg to differ. *See Freytag*, 501 U.S. at 894 n.2 (Scalia, J., concurring in part and concurring in the judgment, joined by O'Connor, Kennedy, & Souter, JJ.) ("[O]ur cases have so often used them interchangeably that it may be too late to introduce precision. . . . I shall try not to retain the distinction between waiver and forfeiture throughout this opinion, since many of the sources I shall be using disregard it."). What is clear, however, is the Supreme Court's admonition in *Schor*: constitutional limits on Article III are not to dangle at the mercy of artfully parsed relinquishment concepts. *See* 478 U.S. at 850–51 ("*notions of* consent and waiver cannot be dispositive" if Article III limitations are at issue (emphasis added)).

obstructed in their ability to make policy. *See generally* THE DECLARATION OF INDEPENDENCE (U.S. 1776). In response, the Founders created a judiciary "truly distinct from both the legislature and the executive." THE FEDERALIST NO. 78, p. 465 (Clinton Rossiter ed., 1961) (A. Hamilton). The "judicial [p]ower" was limited to "render[ing] dispositive judgments" in "cases" or "controversies" within the scope of federal jurisdiction. *See Plaut*, 514 U.S. at 218–19. The judiciary thus received "no influence over . . . the purse." THE FEDERALIST NO. 78, p. 464 (Clinton Rossiter ed., 1961) (A. Hamilton). As the Constitution gave the appropriations power to the American People's elected representatives, our founding document "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *OPM v. Richmond*, 496 U.S. 414, 427–28 (1990); *cf. Freytag*, 501 U.S. at 880 ("The structural interests . . . are not those of any one branch of Government but of the entire Republic.").

*Cy pres* distribution schemes in class actions against the United States confound judicial power; reverting us to the time when the King could circumvent the People's representatives through the judiciary. Ninth Circuit Judge Andrew Kleinfeld described the problem of *cy pres* in class actions rather ominously given *Keepseagle*'s facts:

> A defendant may prefer a *cy pres* award to a damages award, for the public relations benefit. And the larger the *cy pres* award, the easier it is to justify a larger attorneys' fees award. The incentive for collusion may be even greater where . . . there is

> nothing to stop [the lawyers for both sides] from managing the [*cy pres* recipient(s)] to serve their interests . . . .

*Lane v. Facebook, Inc.*, 696 F.3d 811, 834 (9th Cir. 2012) (Kleinfeld, J., dissenting).[7]   Some circuits recognize this potential for conflicting interests and promise "careful scrutiny" of *cy pres* provisions.  *See, e.g.*, *In re Baby Prods. Antitrust Litig.*, 708 F.3d at 175; *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785–86 (7th Cir. 2004).   Other circuits attempt to implement *cy pres* distributions only where "it is not possible to put those funds to their very best use: benefitting

---

[7] This reality of aligned interest bespeaks a broader problem of collusion within class actions—often at the expense of individual class members.  *See* MAYER BROWN, DO CLASS ACTIONS BENEFIT CLASS MEMBERS? AN EMPIRICAL ANALYSIS OF CLASS ACTIONS 9 (2013), https://www.mayerbrown.com/files/uploads/Documents/PDFs/2013/December/DoClassActionsBenefitClassMembers.pdf ("*Cy pres* awards and injunctive relief serve primarily to inflate attorney's fee awards—and benefit third parties with little or no ties to the putative class."); *see also Amchem Prods. v. Windsor*, 521 U.S. 591, 614, 617–18 (1997) (describing the class action device as "adventuresome" and fraught with questions of proper judicial administration).   The class action device is supposed to be nothing more than a mere "species" of joinder.  *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010).   When class actions attempt to circumvent the underlying substantive law, the device has gone beyond its strictures.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) ("[T]he Rules Enabling Act forbids interpreting Rule 23 to abridge, enlarge, or modify any substantive right . . . .").   By breaking the bonds of a case or controversy, *cy pres* in a class action against the United States comes at the expense of the underlying substantive law meant to restrict Government action: Our Constitution.

the class members directly." *Klier v. Elf Atochem N. Am. Inc.*, 658 F.3d 468, 475 (5th Cir. 2011); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 35 (1st Cir. 2009). But the fact remains: "It is *inherently dubious* to apply a doctrine associated with the voluntary distribution of a gift to the entirely unrelated context of a class action settlement, which a defendant no doubt agrees to as the lesser of various harms confronting it in litigation." *Klier*, 658 F.3d at 480 (Jones, C.J., concurring) (emphasis added). The reality Judge Jones identified is at play here. The Executive Branch saw an opportunity to exploit a large settlement award without having to ask Congress for money, class counsel saw the promise of a large fee award, and, suddenly, doubtful claims for monetary damages became a class action worth more than half-a-billion taxpayer dollars.

Both the district court and Mandan consider the American Law Institute's *Principles of the Law of Aggregate Litigation* to set forth "reasonable" criteria to police *cy pres*'s use in class actions. *See Keepseagle*, 118 F. Supp. 3d at 116–17; Plaintiff-Appellant Opening Br. 39–40 (citing *Principles of the Law of Aggregate Litigation* § 3.07 (2010) ("*ALI Principles*")). Yet these principles suggest what the Appropriations Clause and Article III require: *Cy pres* should never be used in class action settlements with the United States.

The *ALI Principles* presume, first and foremost, a settlement fund's outstanding monies will fully compensate class members for their damages. *See ALI Principles* § 3.07(b). But that presumption is inapplicable when, as here, the class members have been fully compensated.

The *ALI Principles* prefer that outstanding monies are distributed to those "whose interests reasonably approximate

those being pursued by the class." *Id.* § 3.07(c). This is achieved by reversion to the Treasury, where Congress can—through the appropriations process—approximate the interests of the class. Because Congress can reasonably approximate the class's interests, reversion to the Treasury is different in kind from reversion to a private defendant. *See ALI Principles* § 3.07(b) cmt. b (explaining reversion to the defendant "would undermine the deterrence function of class actions and the underlying substantive-law basis of the recovery by rewarding the alleged wrongdoer simply because distribution to the class would not be viable"). Congress has a long track record of reasonably approximating the interests of various classes through the creation of victim compensation funds.[8] Moreover, allowing Congress the opportunity to reasonably approximate class interests *furthers* "the underlying substantive-law basis of the recovery" by honoring Congress's limits on the Judgment Fund Act. Reversion to the Treasury ensures public accountability, avoids conferring standing on non-injured third parties to contest *cy pres* distributions, and it comports with Congress deciding whether the Government should waive sovereign immunity and be liable for certain claims in the first instance.[9]

---

[8] The circumstances in which Congress has compensated victims are legion and varied. *See, e.g.*, 12 U.S.C. § 5219a (Home Affordable Modification Program, created by the Emergency Economic Stabilization Act of 2008 in response to the subprime mortgage crisis); 15 U.S.C. § 7246(a) (creating the "Fair Fund" established by the Sarbanes-Oxley Act of 2002 to distribute disgorgement penalties to defrauded investors); 49 U.S.C. § 40101 (creating the September 11th Victim Compensation Fund).

[9] Reversion to the Treasury is also distinct from escheating to the state, another alternative to *cy pres* distributions. Certain requirements must be met for monies deposited with the judiciary to escheat to the United States. *See* 28 U.S.C. § 2041. The issue here,

*Cy pres* distributions, given their range of potential beneficiaries, their attenuated relationships to actual class members, and their focus on fulfilling a general "purpose" rather than remediating monetary damage, resemble legislative appropriation. *See, e.g.*, Redish at 624; Goutam U. Jois, *The* Cy Pres *Problem and the Role of Damages in Tort Law*, 16 VA. J. SOC. POL'Y & L. 258, 260 (2008); *cf. also* THE FEDERALIST NO. 75, at 449 (Clinton Rossiter ed., 1961) (A. Hamilton) (distinguishing legislative and executive power by inquiring into "the particular nature of the power" at issue, and identifying "[t]he essence of legislative authority" in the prescription of general rules for society). Yet Congress made no such appropriation here, and no part of the appropriations process is within the judicial power. *See Buckley v. Valeo*, 424 U.S. 1, 123 (1976) (per curiam) (holding Article III courts may not exercise "executive or administrative duties of a nonjudicial nature"); *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1066 (8th Cir. 2015) ("Distribution of funds at the discretion of the court is not a traditional Article III function," rendering such a *cy pres* provision "void *ab initio*."); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 236 F.R.D. 48, 53 (D. Me. 2006) ("Federal judges are not . . . accustomed to deciding whether certain nonprofit entities are

---

however, is not that the settlement fund's remainder is unable to compensate a claimant for some reason. *Cf. id.* ("This section shall not prevent the delivery of any such money to *the rightful owners* upon security, according to agreement of parties, under the direction of the court." (emphasis added)). Rather, the "rightful owners," the class claimants, have already received what they rightfully own (their respective awards for compensatory damages), and Congress appropriated money for no other expenditure. The only other "rightful owners" are the American taxpayers, who own the remainder pending a decision by their elected representatives to additionally appropriate the remaining money.

more 'deserving' of limited funds than others; and we do not have the institutional resources and competencies to monitor that 'grantees' abide by the conditions we or the settlement agreements set."). Accordingly, regardless of the *cy pres* provision's form, approving recipients and distributions in class actions against the United States gives a court the very influence over the purse prohibited by Article III. *Cf.* THE FEDERALIST NO. 78, at 465 (Clinton Rossiter ed., 1961) (A. Hamilton).

Even in class actions where *cy pres* distributions are not made from the public fisc—and the comingling of legislative and judicial power is not implicated—*cy pres* is problematic for judicial power. A court risks violating Article III justiciability requirements should it adjudicate disputes between *cy pres* recipients and would-be recipients, as none would possess an injury-in-fact. *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 577 (1990) (holding Article III prohibits federal courts from "decid[ing] questions that cannot affect the rights of *litigants* in the case before them" (emphasis added)); *see also Klier*, 658 F.3d at 481 (Jones, C.J., concurring) (explaining how *cy pres* distributions "transform[] the judicial process from a bilateral private rights adjudicatory model into a trilateral process"). In this trilateral process, there is no neutral, adjudicative standard by which a court can determine the "next best" recipient of settlement money—or what to do with the money when no "next best" recipient bears any relationship to the class. *See, e.g.*, *In re Motorsports Merch. Antitrust Litig.*, 160 F. Supp. 2d 1392, 1399 (N.D. Ga. 2001) (distributing, via *cy pres*, approximately $2 million remaining in a settlement pool from a consumer price-fixing lawsuit to nine different organizations, ranging from drug prevention programs, a breast cancer foundation, and a children's hospital,

even though none of those organizations bore any relationship to the injured class—Georgia NASCAR fans).[10]

*Keepseagle* reveals that nothing short of the Constitution's enumerated limits on power can protect the taxpayer's money and the judiciary's integrity. The Executive Branch has an independent obligation to assess the constitutionality of its own conduct. In the first instance, politics should not have been allowed to permit what the Appropriations Clause would prohibit. Similarly, in the first instance, the district court should have never allowed the parties' consent to override its independent obligation to not approve agreements that

---

[10] These problems are compounded by the "appearance of impropriety" created by "the specter of judges and outside entities dealing in the distribution and solicitation of large sums of money." *SEC v. Bear, Stearns & Co.*, 626 F. Supp. 2d 402, 415 (S.D.N.Y. 2009). As numerous press reports and cases indicate, *cy pres* distributions are littered with ethical issues. *See, e.g.*, Richard A. Epstein, Editorial, *The Deferred Prosecution Racket*, WALL ST. J. (Nov. 28, 2006, 12:01 AM), https://www.wsj.com/articles/SB116468395737834160 (criticizing a Bush administration settlement with Bristol-Myers Squibb that required the company's endowment of a—hold on to your hat—chair of ethics at Seton Hall Law School, the *alma mater* of the then-U.S. Attorney for the District of New Jersey); Editorial, *Holder Cut Left-Wing Groups in on $17 Bil BofA Deal*, INVESTOR'S BUSINESS DAILY (Aug. 27, 2014), http://www.investors.com/politics/editorials/holders-bank-of-america-settlement-includes-payoffs-to-democrat-groups/ (criticizing a Justice Department settlement with Bank of America as a "raft of political payoffs to Obama constituency groups"); Adam Liptak, *Doling Out Other People's Money*, N.Y. TIMES (Nov. 26, 2007), http://www.nytimes.com/2007/11/26/washington/26bar.html.

transgress Article III's limits.[11] *See, e.g.*, *Freytag*, 501 U.S. at 896 (Scalia, J., concurring in part and concurring in the judgment) ("[A] litigant's prior agreement to a judge's expressed intention to disregard a structural limitation upon his power cannot have any *legitimating* effect—*i.e.*, cannot render that disregard *lawful*. Even if both litigants not only agree to, but themselves propose, such a course, the judge must tell them no."); *see also Se. Fed. Power Customers, Inc. v. Geren*, 514 F.3d 1316, 1321 (D.C. Cir. 2008) ("[T]he district court could hardly approve a settlement agreement that violates a statute . . . ."). But the violation to our Constitution's structure here is not merely *ex ante* to approving this settlement agreement's *cy pres* provisions. *This violation is ongoing and is jurisdictional.*

The parties have been squabbling over how to modify the *cy pres* provisions to their respective benefit for nearly four years—indeed, that dispute underlies this appeal. *See Keepseagle v. Vilsack*, 307 F.R.D. 233, 238 (D.D.C. 2014) (dating the "potential modification" of the *cy pres* provisions to at least August 2013). The Court's opinion today ensures this will continue, as approval of *cy pres* recipients and distributions—or any additional changes to the *cy pres* scheme—will rest solely on what led to the error in the first instance: substituting the parties' consent for constitutional requirements. This sort of Government-By-Autopilot cannot be reconciled with our Constitution. *Cf.* Randy Barnett, *The Origination Clause and the Problem of "Double Deference," The Volokh Conspiracy*, WASHINGTON POST (Mar. 12, 2014),

---

[11] For these reasons, it is inapposite to conclude that invoking waiver prevents Mandan from "sandbagging" either the Executive Branch or the district court. The rule of law is undermined if "sandbagging" includes a party raising constitutional problems that the Executive Branch and the district court were *obliged* to consider in the first instance.

https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/03/12/the-origination-clause-and-the-problem-of-double-deference/?utm_term=.900b86fc81e1 ("[I]f the courts defer constitutional judgments to Congress, and Congress defers constitutional judgments to the courts, then no one is considering the Constitution itself. Double deference is a shell game.").

"Abdication of responsibility is not part of the constitutional design." *Clinton*, 524 U.S. at 452 (Kennedy, J., concurring). But as a result of the majority's reticence, the judiciary will now be distributing more than $380,000,000 of taxpayer money without congressional appropriation and outside the confines of a case or controversy. "[T]o permit the appellate court to ignore" this jurisdictional, structural defect "because of waiver would be to give the waiver legitimating, as opposed to merely remedial, effect, *i.e.*, the effect of approving, *ex ante*, unlawful action by the appellate court itself." *Freytag*, 501 U.S. at 896–97 (Scalia, J., concurring in part and concurring in the judgment). The Executive Branch cannot continue to pursue this course, and the Judicial Branch had no more power to indulge it today than it had the power to approve the initial *cy pres* provisions. We had an opportunity to eliminate this constitutional breach before it results in material damage to the Constitution's limitations—the approval of *cy pres* recipients and *cy pres* distributions of taxpayer money. Waiving away these constitutional problems is a dereliction of duty.

## II.

*The Appropriations Clause and the Judgment Fund Act Bar a* Cy Pres *Settlement Provision*

*A.*

30

*Congress Only Appropriated Money To Pay "Claims"
Against the United States*

Turning to the merits of Mandan's claim, there is no doubt that the *Keepseagle* settlement reveals a dramatic dilution of Congress's power of the purse—and an abuse of the judiciary's limited role—in furtherance of the Executive Branch's political priorities.

Under our Constitution's Appropriations Clause, the American People's elected representatives possess "a *controlling influence* over the executive power." *See* 1 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES, § 531, p. 384 (Thomas M. Cooley ed., 4th ed. 2011) (emphasis added). By holding this power, Justice Story explained, Congress "holds at its own command all the resources by which a chief magistrate could make himself formidable." *Id.*

The Supreme Court is as stout-hearted as Justice Story. In its very first Appropriations Clause decision, the Court unanimously stated "[i]t is a well-known constitutional provision, that no money can be taken or drawn from the Treasury except under an appropriation by Congress." *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850); *see also Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (explaining the Appropriations Clause "was intended as a restriction upon the disbursing authority of the Executive department"). Even in more recent years, the Court has not wavered. *See, e.g.*, *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (plurality opinion) ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.").

Moreover, the Court has recognized the Clause as a limitation on the Executive Branch's disbursement authority in legal settlements. *See Richmond*, 496 U.S. at 427–28. The Executive Branch threatens the Constitution's structure if it "were able, by [its] unauthorized oral or written statements to citizens, to obligate the Treasury for the payment of funds." *Id.* at 428. In that circumstance, "control over public funds that the Clause reposes in Congress in effect could be transferred to the Executive." *Id.* The question here, therefore, is whether the Executive's "statements to citizens," *i.e.*, what it promised to private parties via settlement, were "authorized" by congressional appropriation. Any part of the Executive's agreement with the private party not "authorized" by congressional appropriation cannot be enforced.

Here, as Mandan explains, two congressional statutes effectuate all that Congress has authorized respecting the *Keepseagle* claims: the Judgment Fund Act and the settlements authority statute. 31 U.S.C. § 1304(a) (Judgment Fund Act); 28 U.S.C. § 2414 (settlements authority statute). These two appropriations are interrelated—the Judgment Fund Act authorizes the payment of "compromise settlements" under the settlements authority statute. *See* 31 U.S.C. § 1304(a)(3)(A) (citing 28 U.S.C. § 2414, permitting the "Payments of judgments and compromise settlements" from district courts and the Court of International Trade). The Judgment Fund is not to be used as another source of congressional appropriation to an agency's programs. Rather, it is designed to ensure claimants "receive prompt payment without awaiting a special appropriation." *United States v. Maryland*, 349 F.2d 693, 695 (D.C. Cir. 1965). The settlements authority statute is broad, but, as explained above, its use must "conform[]" to its "specific statutory limits." *See Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.LC. at 136.

The settlements authority statute gives the Attorney General power to settle "*claims* . . . for defense of imminent litigation or suits against the United States," and such claims "shall be settled and paid in a manner similar to judgments in like causes." 28 U.S.C. § 2414 (emphasis added). The Government Accountability Office ("GAO") has illuminated some of these terms. It explains "for defense of imminent litigation or suits against the United States" means "[t]he agency must be confronted with a genuine disagreement or impasse . . . . There must be a legitimate dispute over either liability or amount." U.S. GOV'T ACCOUNTABILITY OFF., GAO-08-978SP, 3 PRINCIPLES OF FEDERAL APPROPRIATIONS LAW 14-35 (3d ed. 2008) (citing, *inter alia*, opinions of the U.S. Attorney General finding that the compromising parties must have possessed a "*bona fide* dispute as to either a question of fact or of law") ("GAO, PRINCIPLES"). Further, "a compromise settlement which exceeds the authority of the official purporting to make it does not bind the government." *See id.* at 14-34 (citing *White v. U.S. Dep't of Interior*, 639 F. Supp. 82 (M.D. Pa. 1986), *aff'd mem.*, 815 F.2d 697 (3d Cir. 1987); *United States v. Irwin*, 575 F. Supp. 405 (N.D. Tex. 1983)).

*Cy pres* distribution in class actions against the United States cannot satisfy these requirements. As part of settling *Keepseagle*, agents of the Executive agreed to send taxpayer money to as-yet unidentified "nonprofits" and "charities" that possess no claims against the United States. But the Judgment Fund Act and the settlements authority statute require the *prompt* payment of settled *claims* against the United States. The "nonprofits" and "charities" that will receive taxpayer money via *cy pres* are—more than five years since the

settlement agreement's entry[12]—unidentified. More fundamentally, they possess no claims against the United States.

As any potential *cy pres* recipient is neither involved in this litigation nor a party to the settlement agreement, the agreement settled no "*bona fide* dispute" between any potential *cy pres* recipient and the United States Government. *Cy pres* recipients will nevertheless receive access to the settlement fund, akin to being a "compromising party."

In reality, the eventual *cy pres* recipients are being tasked by the Executive Branch and class counsel to fulfill a certain "purpose:" advocate for and assist Native American farmers and ranchers. But, as the U.S. Comptroller General has concluded, when a congressional appropriation limits an agency's action to "remedying [a] violation," it cannot use that appropriation "to carry out other statutory goals of the agency," lest the agency "improperly augment its appropriations for those other purposes, in circumvention of the congressional appropriations process." *See* Rep. to H. Rep. Subcomm. On Oversight and Investigations, B-247155, 1993 WL 798227 at \*2 (Comp. Gen. Mar. 1, 1993); *see also Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim*, 13 Op. O.L.C. 98, 104 (1989) ("[A]ny conclusion that would permit the Judgment Fund to pay out settlements in cases in which it would not pay out judgments would provide

---

[12] Delay results in a further perversion of the Judgment Fund Act. Interest accrued on the remaining amount in the settlement fund will be subject to *cy pres* distribution too. As of October 2014, more than $2.5 million in accrued interest was available for *cy pres* distribution. *See* JA 881–82. The longer it takes to "select" *cy pres* recipients, the more interest will accrue, and the more money will pass through *cy pres* distribution. Compensating class claims is truly ancillary to such a scheme.

agencies with an incentive to urge settlement of cases in order to avoid payment from agency funds. We would not lightly attribute to Congress an intent to create a structure that might encourage settlements that would not otherwise be in the interest of the United States.") [hereinafter *Availability of Judgment Fund*].

Congress intentionally separated Judgment Fund payments from agency appropriation payments. *See, e.g.*, VIVIAN S. CHU & BRIAN T. YEH, CONG. RESEARCH SERV., R42835, THE JUDGMENT FUND: HISTORY, ADMINISTRATION, AND COMMON USAGE 6 (2013) ("[T]he Judgment Fund is limited to *litigative awards*, meaning awards that were or could have been made in a court. Litigative awards are distinguished from administrative awards because the latter are provided for by statute and are paid from an agency's appropriation." (emphasis added)). "Accordingly, settlements . . . could be paid from the Judgment Fund if a judgment *on that claim* would have been paid from the Fund and no other source was mandated by law to pay such settlements." Figley, *The Judgment Fund*, 18 U. PA. J. CONST. L. at 162–63 (emphasis added).[13]

A *cy pres* distribution is not an "award" the *Keepseagle* class claimants could have received by prevailing at trial. Had they proceeded to trial and prevailed on their claims for monetary damages, they would have received compensation for their damages. *Cf. Augustin v. Jablonsky*, 819 F. Supp. 2d

---

[13] In attempting to turn what a "claim" is into a factual dispute, the concurrence looks for shadows where there are none. *See* Concurrence at 4 ("What are 'like causes' to this one? And how are judgments in such cases settled and paid?"). *Whether* one has stated a claim can be subject to factual argument, but *what* a "claim" is— or, if you prefer, what a "cause" of action is—and what kind of relief a claim is capable of yielding, rests on the law.

153, 177 (E.D.N.Y. 2011) (noting the "general legal tenet that compensatory damages should do no more than compensate a victim for [his] injury"). This compensation is, by definition, a money judgment payable from the Judgment Fund. But, had the *Keepseagle* class claimants prevailed at trial, they could not, by definition, receive "*cy pres* damages"—payments that do not compensate them directly but fulfill a "purpose" "as near as possible" to compensating them. A *cy pres* distribution is thus not equivalent to a money judgment at trial. This renders the Judgment Fund Act appropriation unavailable for *cy pres* distributions. *See Availability of Judgment Fund*, 13 Op. O.L.C. at 98–99 (concluding "final judgments . . . are payable from the Judgment Fund if they require the government to make direct payments of money *to individuals*, but not if they merely require the government to take actions that result in the expenditure of government funds" (emphasis added)); *see also* 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.").

The arguments set forth by the Executive Branch and the Plaintiff-Appellees in response cite no supporting legal authority. The Executive Branch all but concedes *cy pres* distributions are not, themselves, compensation for claims against the United States—it just thinks that concern is "irrelevant." *See* Gov't Br. 21 ("Because all of the payments contemplated by the agreement are intended to settle the claims of class members, it is irrelevant whether an entity that might receive a distribution itself has a claim against the government."). The Plaintiff-Appellee's make a similar argument. *See* Plaintiff-Appellee Br. 47 ("There is no independent, additional requirement that each specific payment within that judgment must separately qualify under the Judgment Fund Act."). My colleague apparently agrees. *See* Concurrence at 3–4 (admitting "the nonprofit organizations

that will receive *cy pres* distributions out of leftover settlement funds may not possess any claims against the United States," while excusing this because "the Settlement Agreement did in fact settle claims against the United States"). These contentions have no basis in law.

On the Executive Branch's reading, the Attorney General's settlement authority allows him to make a mockery of Congress's specific statutory limitations. For example, the Executive Branch could enter into a $1 billion settlement agreement fully aware only 1% of appropriated Judgment Fund dollars will be paid to class claimants, while 10% will go to class counsel and the remaining 89% will be distributed via *cy pres*. The Executive Branch, the reasoning would go, was not "legally required to have entered into a less generous agreement" simply because nearly all of the settlement fund will pay for something other than money damage claims against the United States. *See* Gov't Br. 23. If class counsel's "sophistication and effectiveness" can sweeten a settlement by letting the Executive use the settlement to further the Executive's political goals instead of compensating class claimants, the sky is the limit. *See id.* We are nearly there in this case, where the majority of taxpayer dollars will not compensate class members but will pay *cy pres* recipients. This robs the Appropriations Clause of any force by undermining its presumption: Rather than expend public funds "only when authorized by Congress" in an express appropriation, "public funds" may be expended from the Judgment Fund "unless prohibited by Congress." *But see MacCollom*, 426 U.S. at 321 (plurality opinion). Such a view "increase[s] the power of the President beyond what the Framers envisioned, . . . compromis[ing] the political liberty of our citizens, liberty which the separation of powers seeks to secure." *Clinton*, 524 U.S. at 452 (Kennedy, J., concurring).

By binding the United States to these *cy pres* provisions, the Executive Branch arrogated the appropriation power from Congress to itself. *See Richmond*, 496 U.S. at 427–28. The *cy pres* provisions of the parties' settlement agreement therefore exceed the Executive Branch's bargaining authority; they cannot bind the Government. *See* GAO, PRINCIPLES, at 14-34; *cf. Int'l Ass'n of Firefighters*, 478 U.S. at 526 ("[T]he fact that the parties have consented to the relief contained in a decree does not render their action immune from attack on the ground that it violates . . . the Fourteenth Amendment."); *Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.LC. at 140 (concluding the Attorney General "may not enter into a decree that would require unconstitutional government action . . . ."). Most relevant for our purposes, "Article III federal courts may not enforce unauthorized executive branch settlements." *See id.* at 148. A court cannot effectuate this settlement's *cy pres* provisions (*i.e.*, it cannot approve *cy pres* recipients or distributions), nor can a court approve the addendum to the *cy pres* scheme at issue here—or any other addendum permitting *cy pres* recipients and distributions.

## *B.*

### *Remedies Going Forward*

The more than $380,000,000 remaining in this settlement fund should revert to the U.S. Treasury. This remedy respects Congress's appropriations power, "corrects the parties' mutual mistake" (if we want to call it that) "as to the amount required to satisfy the class members' claims," and it ensures the judiciary does not "effectuate transfers of funds from [the Government] beyond what [it] *owe*[*s*] *to the parties* in judgments or settlements." *See Klier*, 658 F.3d at 482 (Jones, J., concurring). The Executive Branch concedes that

this is the proper remedy. *See* Gov't Br. 24. Mandan responds by saying "[t]here is no language in the Settlement Agreement to support a reverter[,] and courts have consistently rejected requests by defendants for reverter of residual settlement funds." Plaintiff-Appellant Reply Br. 12. But none of Mandan's cited cases deal with *cy pres*'s constitutional infirmities in class actions against the United States Government.

Our Court does, and should, "decline[] to adopt [Appellant's] suggestion to distribute unclaimed funds to those individuals who make claims; such a procedure would result in those class members receiving a windfall from the public fisc and is inconsistent with the general legal tenet that compensatory damages should do no more than compensate a victim for [his] injury." *Augustin*, 819 F. Supp. 2d at 177. But by affirming the district court's approval of the *cy pres* addendum, the majority proves itself a faint-hearted friend of the public fisc. Even if this Court will not look after the People's money, that does not mean the Justice Department— and Congress—lack means to do so. *Cf. Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 661 (2007) (Ginsburg, J., dissenting), *superceded by statute*, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5 ("Once again, the ball is in Congress'[s] court. As in 1991, the Legislature may act to correct this Court's parsimonious reading of Title VII.").

Before the *cy pres* process begins, the Justice Department should consider a motion under Federal Rule of Civil Procedure 60(b)(4) to strike the *cy pres* provisions within the settlement agreement as void. No party has raised a Rule 60(b)(4) challenge in this case, and it is not subject to the finite time constraints restricting other Rule 60(b) motions. *See* FED. R. CIV. P. 60(c)(1). This course could remove the *cy pres* provisions before recipients are approved and distributions

begin. This should not affect the settlement agreement's applicability between the class members and the United States—the class members have already been compensated, and the *cy pres* provisions may be severed from the rest of the agreement. *See* JA 438 (Original Settlement Agreement, XXVI. Severability). Indeed, the parties' agreement prohibits any of its provisions from "impos[ing] on the Secretary [of Agriculture] any duty, obligation, or requirement" that "would be inconsistent with federal statutes or federal regulation in effect at the time of such performance." *See id.* (Original Settlement Agreement, XXIII. Duties Consistent with Law and Regulations).

The Justice Department can argue, as explained above, that the Executive Branch lacked the constitutional and statutory authority to enter into these *cy pres* provisions. It cannot be required to continue to ask the judiciary to approve and police a *cy pres* distribution scheme that violates the Appropriations Clause and Article III limitations. As the Executive Branch said when contesting class counsel's proposed attorney fee award in this case, "the government has an interest in ensuring . . . that funds coming ultimately from federal coffers are not expended in an unnecessary or unreasonable manner." Gov't Resp. to Pls.' Mot. for Att'y Fees and Expenses and to Pls.' Mot. for Approval of Class Representative Incentive Awards at 2, *Keepseagle v. Vilsack*, No. 1:99-cv-03119 (D.D.C. Mar. 18, 2011), ECF No. 586. What was true then is true now. As objections rooted in the Constitution's structural, jurisdictional limits on judicial power cannot be waived or consented to, and no *cy pres* process has occurred yet, objecting to the provisions before the Judicial Branch effectuates them is certainly "within a reasonable time" for purposes of Rule 60(b)(4). *See* FED. R. CIV. P. 60(c)(1); *Karsner v. Lothian*, 532 F.3d 876, 886 (D.C. Cir. 2008) (explaining that, "before a judgment may be deemed void

within the meaning of [Rule 60(b)(4)], it must be determined that the rendering court was powerless to enter it").

More broadly, the Justice Department should consider setting forth specific settlement guidelines disapproving the use of *cy pres* in class settlements with the United States. These guidelines could provide a prelude to congressional action.

As for Congress, it should consider amending the Judgment Fund Act to explicitly bar *cy pres* distribution schemes in class action settlements with the United States. As Mandan points out, "the Executive Branch may not do indirectly what it is barred from doing directly." Plaintiff-Appellant Opening Br. 29 (citing *United States v. Bowman*, 341 F.3d 1228, 1240 (11th Cir. 2003)). But this lawsuit reveals the degree to which implicit limitations on power are contingent upon the good faith of those exercising power. *Cf. Clinton*, 524 U.S. at 452–53 (Kennedy, J., concurring) ("The Framers of the Constitution could not command statesmanship. They could simply provide structures from which it might emerge. The fact that these mechanisms, plus the proper functioning of the separation of powers itself, are not employed, or that they prove insufficient, cannot validate an otherwise unconstitutional device."). Further, to ensure the Executive Branch is not letting political calculations supplant legal judgments at the taxpayer's expense, Congress should also consider authorizing the Comptroller General to review and report to Congress on any class action settlement in excess of $100 million.

## III.

More than a century ago, Yale Professor William Graham Sumner famously discussed "The Forgotten Man." *See* William Graham Sumner, *The Forgotten Man*, *in* THE FORGOTTEN MAN AND OTHER ESSAYS 465 (Albert Galloway

Keller ed., 1919). The Forgotten Man is the one left behind in the Government's rush to "right" every perceived "wrong." Sumner eloquently set forth the formula embraced by the social engineers of every age:

> As soon as A observes something which seems to him to be wrong, from which X is suffering, A talks it over with B, and A and B then propose to get a law passed to remedy the evil and help X. Their law always proposes to determine what C shall do for X, or, in the better case, what A, B, and C shall do for X.

*Id.* at 466. "C," of course, is "The Forgotten Man." He is "the hidden taxpayer, the average citizen—not someone who received, rather someone who paid in." Amity Shlaes, THE FORGOTTEN MAN: A NEW HISTORY OF THE GREAT DEPRESSION 128 (2007). As Sumner says of "C," "He works, he votes, generally he prays—but he always pays—yes, above all, he pays." Sumner, *The Forgotten Man*, *in* THE FORGOTTEN MAN AND OTHER ESSAYS 491 (Albert Galloway Keller ed., 1919).

*Keepseagle* is Sumner's formulation come to life, and our decision today only entrenches the American People's status as the Forgotten. The Executive Branch saw a wrong to correct— discrimination against Native-American farmers. It talked it over with class counsel, eager to receive a big payday. They then worked together to ensure a vastly-overinflated settlement amount that would leave a huge sum to "remedy the evil" via *cy pres*. Lost in the midst of their self-congratulation is the

plight of "C," the American People that pay for the Executive Branch's outsized misadventure and class counsel's fee feast.

To the extent discrimination occurred against Native-American farmers by the Department of Agriculture, it was *the Department of Agriculture, not the taxpayers of the United States*, that engaged in discrimination. Those allegedly discriminated against have been compensated by the public fisc, and that payment occurred via a process that—while ripe with politics and folly—was ultimately permitted by law. But, to the extent the Government would like to *additionally* account for this discrimination by funding nonprofits and charities that work to end discrimination against Native Americans, this should be the decision of the People and their elected representatives. It should *not* be the decision of Justice Department lawyers, class counsel, and the judiciary.

John Adams's observation, "[o]ur Constitution was made only for a moral and religious People" and is "wholly inadequate to the government of any other," is often quoted. *See* Letter from John Adams to Massachusetts Militia, 11 October 1798, *Founders Online*, NATIONAL ARCHIVES, https://founders.archives.gov/documents/Adams/99 -02-02-3102. Few, however, explain what he meant. In the same passage, Adams admonished an America that "assume[d] the Language of Justice and moderation while it is practicing Iniquity and Extravagance." *Id.* In such a nation, he warned, "Avarice, Ambition [and] Revenge or Galantry, would break the strongest Cords of our Constitution as a Whale goes through a Net." *Id.* Jurist Thomas Cooley arrived at the same sentiment when he wrote a constitution cannot be completely understood by its words, but must also make reference to "that body of rules and maxims in accordance with which the powers of sovereignty are habitually exercised." THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH

REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 2 (1868). There are, in short, *norms* upon which self-government depends. The Constitution presumes them, but the character of our people determines whether we keep them. *See* THE FEDERALIST NO. 1, at 27 (Clinton Rossiter ed., 1961) (A. Hamilton) ("[I]t seems to have been reserved to the people of this country, *by their conduct and example*, to decide the important question, whether societies of men are really capable or not of establishing good government from reflection and choice, or whether they are forever destined to depend for their political constitutions on accident and force." (emphasis added)). The conduct of those in this case proves how little the Constitution will matter when good character ceases to be informed by adherence to one's oath of office, and is primarily defined by how generous you are willing to be with someone else's money.

I respectfully dissent.